Filed 5/2/25  P. v. Arellano CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN JESUS ARELLANO,<br><br>Defendant and Appellant. | F085948<br><br>(Super. Ct. No. F20907464)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant Christian Jesus Arellano was convicted of offenses involving the sexual molestation of A.S.,[1] who is defendant's little sister.  The molestation occurred when A.S. was between five and 13 years old.  However, the charged offenses (counts 1 through 4)[2] occurred in 2018.  Thereafter, defendant was found guilty on all counts and sentenced to a total aggregate term of 30 years to life.

On appeal, defendant contends:  (1) "[t]here was insufficient evidence to establish that the oral copulation was accomplished against [A.S.'s] will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Counts 2 and 4)"; (2) that "[b]ecause the evidence supporting the element of force was questionable as to Counts 1 and 2, the court was required to instruct sua sponte on lesser included offenses that did not involve the use of force;" and (3) it was improper for the Child Sexual Abuse Accommodation Syndrome (CSAAS) expert (David Love) to testify the "CSAAS doctrine prohibits jurors from considering the demeanor of a complaining witness giving testimony from the stand," and that he gave improper testimony regarding " 'grooming.' "  (Italics omitted.)

Further, defendant contends the trial court prejudicially erred when it:
(1) admitted both Rosa S. (A.S.'s mother) and defendant's statements reflected in the 2010 police report; (2) allowed S.V. (A.S.'s sister) to testify to prior sexual acts against her; (3) failed to instruct the jury with CALCRIM No. 224, a necessary adjunct to CALCRIM NO. 1191A; (4) instructed the jury with CALCRIM No. 1191A because it permitted the jury to make an irrational impermissible inference of propensity, which constituted a violation of due process; and (5) imposed consecutive life sentences

---

[1]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.

[2]    We will discuss in detail below all the offenses by which defendant was convicted.

2.

(15 years to life) on counts 1 and 2 pursuant to Penal Code[3] section 667.6, subdivision (d), because "[t]he finding that the offenses occurred on 'separate occasions' is not supported by substantial evidence, for there was no evidence of any interval between the two offenses to show a reasonable opportunity to reflect." As to this final contention, the People concede error.

We accept the People's concession and conclude the trial court erred in imposing a full consecutive sentence on count 2, pursuant to section 667.6, subdivision (d). Further, although we conclude that Love's testimony about grooming was improper, we find that any error was harmless. Therefore, we remand this matter for resentencing. As to defendant's remaining contentions, they lack merit. Accordingly, we affirm the judgment.

## STATEMENT OF CASE

On June 30, 2021, the Fresno County District Attorney filed a second amended information charging defendant with the crime of aggravated sexual assault (rape) against A.S. (§ 269, subd. (a)(1), count 1), a child under the age of 14 years, and that defendant was more than seven years older than A.S., with the allegation the rape was accomplished by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on her person (§ 261, subd. (a)(2)); aggravated sexual assault (oral copulation) against A.S. (§ 269, subd. (a)(4), count 2), a child under the age of 14 years, and that defendant was more than seven years older than A.S., with the allegation the oral copulation was committed by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on her person (§ 287, subd. (c)(2)(A)); a forcible lewd act, to wit, vaginal sexual intercourse, upon A.S., a child under the age of 14 years

---

[3]     Further undesignated statutory references are to the Penal Code.

3.

(§ 288, subd. (b)(1), count 3); and a forcible lewd act, to wit, oral copulation, upon A.S., a child under the age of 14 years (§ 288, subd. (b)(1), count 4).[4]

On July 7, 2021, a jury found defendant guilty of all counts. Subsequently, as to count 1, the trial court sentenced defendant to the indeterminate term of 15 years to life. As to count 2, the trial court sentenced defendant to the indeterminate term of 15 years to life, to run consecutive to count 1. As to counts 3 and 4, the trial court sentenced defendant to the lower term of three years, but stayed these sentences pursuant to section 654. The total aggregate sentence imposed was an indeterminate term of 30 years to life.

## SUMMARY OF FACTS

### I. Prosecution Case-in-Chief

#### A. Background

A.S. was born in 2006 and was 14 years old at the time of trial. At the time A.S. testified, she was four feet 11 inches tall. A.S. had a twin sister, E.S.,[5] and an older sister, S.V. A.S. also had three older brothers—A., M.S., and defendant. Defendant was 10 years older than A.S. Rosa S. raised all the children as a single mother.

Initially, the family lived at a house in Fresno. A.S. shared a room with her sisters, while A., M.S., and Rosa had their own rooms. Defendant lived in the garage.[6] However, in 2017, the Fresno house burned down and the family lived in a hotel for a couple of months before moving into a house in Clovis.

Subsequently, in 2018, A.S.'s grandmother, Yesenia B., moved in with the family and "stayed with [Rosa] sometimes, and she would also stay in the living room." Around

---

[4]    As to counts 1 through 4, it was alleged these offenses occurred "[o]n or about September 11, 2016 through November 16, 2019."

[5]    E.S.'s first name is spelled differently throughout the record.

[6]    A.S. testified, "[T]here's like a lot of times where we had to switch rooms or some of us had to share rooms. [Defendant] had—always had his own room. He was the oldest in the house, so I think that's kind of how it goes."

this same time, Rosa started a business selling homemade bread baked to order and "would work … all the way 'til 3:00 in the morning sometimes." Eventually, in 2019, before A.S. began her eighth-grade school year, the family moved back to their Fresno house. Yesenia continued to live with the family.

In 2019, A.S. attended school in Fresno. The school holds classes for students in the seventh through 12th grades.

### B.    *Charged and Uncharged Sexual Offenses*

#### 1.    <u>The First Sexual Assault (2011)</u>

In January 2020, A.S. told a deputy that defendant first sexually assaulted her when she was five years old. During this first incident, defendant took A.S. to her room and told her to put on a dress. A.S. put on the dress and was not wearing underwear when defendant laid down next to her in her bed. At this point, defendant "put his finger inside of [A.S.'s vagina]." Defendant also tried to push himself onto A.S. and began breathing on her neck. A.S. told defendant to stop, but he refused. Eventually, Rosa came home and defendant "got up so fast. Like he was startled. He got up and he got out of the room and [A.S.] was just left there." As it related to this first incident, A.S. testified as follows:

> "[W]hen I was little I was like clingy, like I had like attachment, you know. But I felt comfortable knowing that it was my family, you know, so the side kisses and hugs and stuff like that never really phased me. I never, never thought anything of it until that day I—you know—I—at first I felt like horrible and I didn't know. I felt like I had done something wrong. Um, but after that you know I was like, you know, it's brotherly love[7] and stuff like that. You know, I was—I had mixed feelings about it. I didn't know what to think."

After this first incident, defendant would ask A.S. to go to the bathroom with him. Specifically, A.S. described it as "sort of like begging … when people weren't around or

---

**7**    Defendant described his behavior as "brotherly love."

weren't paying attention." Defendant "would stand in front of the hallway and you know whisper to [A.S.] like to come over and he would just say, please, please, please, please." A.S. testified "it was almost like [defendant] needed it. Like he was desperate for it … and it almost seemed like it wouldn't stop until [A.S.] did go" to the bathroom with him. In order to get what he wanted, defendant bribed A.S. with "let[ting] [her] use [his] phone" or he would take her to the store and buy her things.

A.S. did not realize defendant's behavior was wrong until she was in the first grade. Specifically, A.S. "went to school and [her] teacher had handed out a book to [her] and it was like a good touch/bad touch book." A.S. became really confused, but "reading that book was kind of like … an eye-opener." Nonetheless, there were times when defendant and A.S. spent time together inside the house and nothing sexual occurred.

### 2. Penetrative and Oral Sex (2012 or 2013)

Defendant first had penetrative sex with A.S. when she was either six or seven years old. This happened "[a]lmost every day" in places around the house, such as the bathroom, A.S.'s bedroom, and the garage. A.S. would try and keep defendant out of her room by "[l]ocking the door," but "he knew how to unlock it somehow … either with a credit card or [his] fingernails."

In the bathroom, defendant "would put [A.S.] over the sink" and place his penis inside her vagina. Defendant also tried to anally penetrate A.S. "once or twice," but she "was moving way too much because it hurt way more" so he stopped doing it. Further, during these assaults, defendant would make A.S. orally copulate him "most of the time" and "[a] lot of times" he would touch her vagina with his mouth. During some of these incidents, A.S. observed a white substance come out of defendant's penis. A "couple of times" defendant used a condom.

Eventually, A.S. told defendant no, which caused him to become "more forceful, like more aggressive." He would cover A.S.'s mouth and "us[ed] force like grabbing

6.

[her] wrists and … [her] hair." After defendant finished, "[h]e would ask [A.S.] if [she] missed him."

Before the 2017 Fresno house fire and after A.S. was six or seven years old, A.S. told Rosa that defendant was having vaginal sex with her. She never told Rosa about the oral copulation and anal penetration.

### 3. Shower Incident

A.S. testified to a specific incident that occurred before the 2017 Fresno house fire. Specifically, defendant told everyone "he was going to take a shower and so he brought [A.S.] in the bathroom with him and he started undressing and he undressed [A.S.] and he got in the shower and he brought [her] in with him." Defendant then touched A.S.'s breast and placed his fingers inside her vagina.

Eventually, Rosa's friend, Patricia R., who lived at the house at the time, came home and called out for A.S. Defendant "kind of tried to hurry up and … put [A.S.'s] clothes on and stuff like that." A.S.'s "hair was wet because of the water and [defendant] tried to dry it really quick and [Patricia] knocked on the door and she asked him where [A.S.] was and he said he didn't know." Defendant then "tried to push [A.S.] out the window." A.S. jumped out of the window and walked to the front of the house. Patricia asked A.S. where she was and A.S. responded that she "was in the front yard." Patricia became very upset.

### 4. The Kentucky Incident

A.S. also testified to an incident that occurred at a group home located in Kentucky. A.S. "went to Kentucky multiple times to visit" defendant. During one visit, defendant placed his fingers inside A.S.'s vagina and forced her to orally copulate him. A.S. began to cry, which resulted in defendant taking A.S. outside and locking her out of the house. At this point, A.S. got attacked by a goat while the whole family watched from inside the house. A.S. told Rosa that defendant "touch[ed] [her] private parts."

7.

### 5.      Incidents at Defendant's Apartment

Defendant eventually lived at an apartment in Fresno with a roommate.  A.S. testified defendant sexually assaulted her at the apartment "a couple of times … two or three."  Specifically, she described an incident where Rosa dropped her "off and went to go get some food."  A.S.'s siblings were in a room watching television while defendant assaulted her "[o]n his bed."  A.S. told Rosa she felt uncomfortable going to defendant's apartment, but never discussed the assaults that occurred at the apartment.

### 6.      The Biting Incident (2018)

A.S. told the deputy the final sexual assault occurred in 2018 at the Clovis house. This incident occurred when A.S. was 13 years old.  Specifically, A.S. went downstairs to get a beverage out of the refrigerator, while her siblings and cousin were playing video games and listening to music upstairs.  A.S. "didn't know that [defendant] was downstairs; if [she] did, [she] wouldn't have gone downstairs by [her]self."

As A.S. was in the kitchen, she "turn[ed] around and [defendant] was right there." A.S. "told him that if he moved or anything, if he didn't let [her] go upstairs, [she] was going to scream as loud as [she] could."  However, defendant "grabbed [A.S.] by [her] mouth and took [her] into the living room and he put [her] on the couch."  Defendant then "got on top of [A.S.]" and placed his weight on top of her to the point that A.S. believed her "body was being crushed."  Defendant let go of A.S.'s mouth and pulled down his pants; A.S. "was like struggling and [she] didn't know what to do, and so [she] … bit his arm."  In response, defendant "bit [A.S.'s] lip, like [her] whole mouth."

A.S. then ran upstairs and went into her cousin's bedroom.  Her cousin, her brother, M.S., her sister, S.V., and her twin sister, E.S., were all in the bedroom.  A.S. "turned on the light and [E.S.] saw that [her] whole lip was like bruised."  M.S. also "saw [A.S.'s] face [and] he was also shocked … like he was like, Oh, my goodness what happened?"  At this point, defendant went upstairs and told everyone A.S. had bit his arm.  A.S. admitted she had bit defendant, but told everyone she "was like trying to get

8.

him off of [her]." M.S. then responded, "Well, you bit him. Like what do you expect him to do?" That was the end of the discussion.

### 7. Charged Sexual Assault (Counts 1 through 4)

A.S. testified the final sexual act of penetration and oral copulation occurred in 2018.[8] During this incident, A.S. woke up in the middle of the night and found defendant laying on top of her. Defendant placed his hand over A.S.'s mouth and removed both his and her pants. A.S. could not move, she felt "hopeless," and tried to squirm away.[9] She initially tried to push him off, but eventually she "didn't try to fight him on it … [she] kind of gave up … on trying to stop him."

Defendant then held down A.S's legs in an uncomfortable position. At this point, defendant put his erect penis into her vagina, which A.S. testified, "It hurt." Defendant moved his penis back and forth. As defendant held A.S. down, he placed his penis in A.S.'s mouth. This made A.S. gag. She again did not try and resist because she "had given up at that point." A.S. testified she was scared during the entire incident. Specifically, A.S. testified:

> "I didn't know how anything was going to play out, and it was—it was very like confusing for me. I didn't know, you know, if what he was telling me was true. You know, I got the kind of—the—how do you say that—you know, I was being told, Oh, it's just love, you know, it's a brotherly love, and I didn't understand why it was hurting. I didn't understand why I was getting held down and stuff like that. It was very, very confusing to me. And the fear of not knowing if it was true or not was very intense."

---

[8]    A.S. testified to the following timelines: (1) the incident occurred in the new Fresno house two months before her disclosure on November 19, 2019; (2) the incident occurred "sometime between 2017 and September 19th or so, 2019"; (3) the Clovis biting incident was the last incident that occurred and there were no assaults thereafter; and (4) the incident happened in 2018, after the fire, which means it occurred in the Clovis house. On redirect, A.S. confirmed the incident occurred in 2018.

[9]    A.S. testified defendant was a lot bigger than her.

### C. Conversation with Social Worker Elana O. (February 2019)

In February 2019, A.S. spoke with a social worker, Elana O., about someone in her family hurting her in a way that made her feel uncomfortable. However, she did not specifically name defendant as her abuser. A.S. testified she did not disclose defendant's name because she "was at [her] school and it was really hard especially because [Rosa] showed up." Nonetheless, Rosa confronted defendant about A.S.'s disclosure. Rosa "told him that [A.S.] reported being touched, and [defendant's] response was that [she] was lying." Rosa did not believe A.S.

Later that same day, A.S. spoke with Elana a second time. During this second conversation, A.S. denied anything happened within the household because she feared punishment and shame by her family. Specifically, A.S. testified she "knew that speaking up was … going to cause a lot of emotions for [her]. It was going to overwhelm [her]. And [she] would get a lot of blame … from [her] siblings."

### D. The Family Incident that Occurred the Weekend Before the November 19, 2019 Disclosure

Both parties stipulated, "There was an incident that happened within the family the weekend before November 19th, 2019." Specifically, A.S. testified she got into a verbal argument with defendant because he attempted to try and stop her from breaking the rules within the house. She further testified she did not recall ever telling defendant she "could get [him] locked up."

### E. The November 19, 2019 Disclosure

A.S.'s after-school tutor, Jeff B., formed a relationship with A.S. and she believed she could speak with him about personal matters. Around November 2019, Jeff "could tell by [A.S.'s] facial expressions she had something on her mind … [she] started talking back, arguing more than normal, so [he] knew something was going on." On November 18, 2019, Jeff "received an email after school saying that [A.S.] needed to

10.

report someone—report something … And [he] said, Well, when you come to school tomorrow we will report it to whoever the right person is."

The next morning, A.S. "came straight to [Jeff's] classroom." "She was emotional. She was very torn, didn't know what to do. And [Jeff] just told her, Please, just be honest with whatever happened, and we'll get you the help you need." Eventually, A.S. spoke with the Vice Principal, Richard S., and "told him that ever since [she] was five [she] was raped by [her] brother [defendant]." At this point, Richard directed A.S. to speak with Vice Principal, Rhonda D. A.S. reiterated to Rhonda that "ever since [she] was five [her] brother was raping [her] 'til [she] was 13." A.S. felt both sad and angry because "it happened for so long and [she] felt like saying something before … [and] it could have stopped years beforehand and it didn't have to get to the point where it was at."

A.S. also told Rhonda about the "manipulating situation" she faced at home where she believed that if she said anything she would be "punished" or "treated differently." Rosa "ha[d] always said from the beginning that she was going to protect her son [defendant] no matter what." During this entire interaction, Rhonda testified A.S. "was sad and distraught, like something was weighing heavy on her." At this point, Rhonda notified law enforcement and a deputy arrived at the school a couple hours later.

### F.    A.S. Discloses to Nicole B.

Nicole was married to A. (A.S.'s older brother) until they became divorced. Nicole went to church with A.S. During one church service, Nicole told the congregation "[s]he was touched when she was younger by family members."

On several occasions, A.S. told Nicole defendant had sexually abused her—specifically, forcing A.S. to engage in both vaginal sex and oral copulation. During one specific incident, Nicole offered to take A.S. to the police station to file a report, however defendant "told [Rosa] that Nicole offered to take [A.S.] to report it [and] [Rosa] then kicked Nicole out of the house and told her that she was not welcome at the house."

11.

### G. Prior Sexual Assaults of S.V.

S.V. was born in 2004 and was 16 years old at the time of trial. On November 19, 2020, S.V. had an interview with a Fresno County District Attorney Investigator. During this interview, S.V. told the investigator she had talked to her uncle, Israel S. (Rosa's brother), about how defendant had assaulted her. Israel "would make comments about [S.V.'s] foster parents, and the fact that [she] chose to live here instead of there." S.V. believed Israel was "guilt tripping" her "[a]bout not wanting to come back home."

Specifically, S.V. testified that defendant sexually assaulted her at the Fresno house when she was between the ages of eight and 13. These assaults happened mostly in the bathroom, but also occurred in the living room, hallway, and S.V.'s bedroom. Defendant would insert his fingers into her vagina and place his hand over her mouth. During two of these assaults, defendant made S.V. place her mouth on his penis and he also placed his mouth on her vagina. She testified the oral copulation occurred in the living room when she was between eight and 10 years old.

During one specific incident, A.S. observed defendant "take [S.V.] into the bathroom and [S.V.] calling [A.S.] to call [Rosa]." In the bathroom, defendant pulled S.V.'s pants down and inserted his fingers into her vagina. She tried to get away, but was unable because "he would have his hand around [her] mouth." Defendant "tr[ied] to put [S.V.'s] hand on his penis." He made her hand move up and down. Afterward, defendant took A.S. into the bathroom with him.

During a separate incident, defendant placed his hand over S.V.'s mouth in the hallway and took her to a different room. At this time, Rosa was "around the corner." S.V. "told [Rosa] that [defendant] put his hand over [her] mouth and he's trying to hurt [her]." She talked to defendant and told S.V. to go to bed.

S.V. also testified to an incident where her "sisters were in the car." Specifically, defendant "kept pushing [her] towards him, there was a sliding door next to him, but he

12.

kept like grabbing [her] and sitting [her] on his lap." Defendant had his hands around her waist and she could feel his erect penis.

In 2009, Rosa reported a sexual assault to police when S.V. was five years old. The "police were called multiple times, but [defendant] still lived under the roof."

S.V. told the investigator that during one incident she "ran to a friend's house across the street." She asked if she could "stay there so that nobody could hit [her] or nobody could hurt [her]." However, A. "caught up to [her] and grabbed a hanger and started hitting [her] over and over telling [her] not to lie about [defendant]." S.V. then went into a room with two of her cousins and "they locked the door on [A.]" While inside "they told [S.V.] [to] draw on paper what [she] saw, which was [defendant's] privates." Rosa then made S.V. sleep in a different room than the boys.

During cross-examination, S.V. testified that A.S. has trouble telling the truth and that she was a "compulsive liar."

### H.    CSAAS Evidence

David Love is a licensed marriage and family therapist with expertise in child sexual abuse. Love testified as an expert in child sexual abuse approximately 150 to 175 times over the past 25 years. Love did not have any knowledge about the underlying facts of this case.

Love described the common behaviors associated with CSAAS. The four components of CSAAS Love relied on during his testimony were secrecy; helplessness; entrapment and accommodation; and delayed and/or unconvincing disclosure.

Secrecy describes why children do not tell someone—such as a parent, grandparent, caretaker, or teacher—that they have been molested. Love testified the reason why children keep the abuse a secret is because they "feel often guilty … and feel like they did something wrong … so they feel ashamed." Further, children may decide to keep the abuse a secret through coercion or bribery by the abuser.

13.

As to helplessness, children are unable to escape the abuse. Specifically, children "kind of detach themselves emotionally, and just kind of put up with it 'cause in their perception only they can't figure out a way out, or tried some ways out and they were unsuccessful."

As to entrapment and accommodation, this factor looks to how children "survive emotionally, psychiatrically, psychologically in this very abusive and place in life." Essentially, this factor considers "how they accept the situation and how they adapt." Often, if a child feels trapped, "they [will] self medicate with drugs and alcohol."

The final factor Love testified to was delayed and/or unconvincing disclosure. As to delayed and/or unconvincing disclosure, children "are conflicted about even coming forward, and what to talk about." Therefore, "because of the way trauma memory is encoded in the brain it's not always very convincing because it's a little confusing the way it comes out over a series of interviews." "[I]t's not uncommon [for a child] to wait at least five years" before reporting abuse. Further, a child may provide inconsistent details regarding the abuse to different people depending on their level of trust with that person.

## II.     Defense Case-in-Chief

### A.     Rosa S.'s Testimony

Rosa was a single mother of six children with defendant being the oldest. Her other children included A., M.S., S.V., E.S., and the youngest, A.S. She testified she had a close relationship with A.S. and that A.S. never complained to her regarding vaginal sex, oral copulation, or anal sex with defendant. She stated that if A.S. ever told her about any abuse she would have reported defendant to the authorities.

Rosa testified an incident occurred in 2010, which caused her to send defendant away to another home because "he kissed [S.V.] like the Disney cartoons, and that he fondled her, that he touched her." S.V. told Rosa defendant "grabbed her from her butt"

14.

and that he tried to show his "tail"[10] to her.  Rosa reported this incident to law enforcement and "went to CPS [her]self and got into family maintenance."  She was fearful for her children's safety.

However, Rosa did not believe defendant sexually assaulted A.S.  She believed A.S. was lying about all the assaults.  Overall, Rosa did not want defendant to get in trouble because she "love[d] all [her] children."

### B.      Yesenia B.'s Testimony

Yesenia lived with the family from August 2018 until November 2019.  Yesenia testified A.S. was "always rebellious" and "talking over other people."  Defendant attempted to discipline A.S., but "she would always answer with bad words."  A.S. had a problem with lying and never disclosed any abuse to Yesenia.

### C.      David B.'s Testimony

David B. met Rosa at church and "got to know the family."  At times, A.S. and Rosa got into disagreements and A.S.'s demeanor toward Rosa would be disrespectful at times.  Neither A.S. nor S.V. disclosed any abuse to David.

### D.      Nicole B.'s Testimony

As indicated above, Nicole was married to A.S.'s brother, A.  In 2017, Nicole went to the same church as the family.  During this time, she "shared with the church that [she] was sexually abused as a child."  Subsequently, A.S. approached Nicole and "told [her] that she experienced it as well."  Specifically, A.S. told Nicole "she was continuously going through this process of getting abused."  She told Nicole that defendant was having vaginal sex with her.  However, Nicole did not believe A.S. "[b]ecause [she] knew the same way that she said those words were exactly what [Nicole] told the church, so [Nicole] knew that was [her own] story."  A.S. never again mentioned any abuse to

---

**10**      Rosa described defendant's "tail" as his penis.

Nicole. Nicole further testified that A.S. and defendant appeared to have a normal sibling relationship.

### E. *Chloe C.'s Testimony*

Chloe testified she had been good friends with defendant "for the last 4 years," which eventually led to a dating relationship. She testified defendant "was basically like the man of the house[,] [h]e brought in money for his mother[,] [h]e went to work every single day, two jobs[,] … [and] [h]e was basically like a father-figure at the house to his siblings and to his mother." Chloe described defendant and A.S.'s relationship "[j]ust how [a] normal brother and sister would act, playful, laughing, sometimes joking with each other, making fun of each other, just how a big brother would." However, defendant and A.S.'s relationship would be strained, which resulted in A.S. "threaten[ing] to get [defendant] locked up."

### F. *Defendant's Testimony*

Defendant testified in his own defense. He was born in 1996 and was 25 years old at the time of trial. He testified A.S. "would talk back or just be very disrespectful to other adults." Defendant would try and discipline A.S., but she "[t]hreatened to call the cops [and stated] [i]f you touch me, you hit me, you slap me, or you yell at me, or even get close to me, I'll call the cops and get you thrown in jail." He flatly denied A.S.'s accusations made against him.

On cross-examination, defendant was confronted with the police report regarding the 2010 incident involving him and S.V. Defendant testified he did "not remember anything about 2010 or that report." Defendant's belief was that A.S. and S.V. made up the allegations against him because he disciplined them very hard.

## III. People's Rebuttal

### A. *Sergeant Floyd Avila's Testimony*

On November 13, 2010, Sergeant Avila spoke with A.S. about defendant sexually assaulting her at the Fresno house. A.S. showed Officer Avila the bathroom where

16.

defendant kissed her on the cheek.[11]  Further, Rosa told Sergeant Avila the kiss occurred in "the girls' restroom."

### B.      *Retired Deputy Robert Rusche's Testimony*

Deputy Rusche testified remotely and read portions of his report summarizing statements made by Rosa and defendant at the Fresno house on November 13, 2010.[12] Specifically, as to Rosa's statement, the following was read into the record:

> "Rosa [S.] identified herself as the mother of [defendant] … and also mother of [S.V.]  Rosa stated that about two years ago [defendant] was caught rubbing his penis on [S.V.] in San Diego, and that he was arrested for both that and a battery in San Diego, California.  She said that he was put on probation and sent to a psychologist and counseling.  [S.V.] told her that [defendant] had taken her sister [A.S.] into the bathroom and kissed her and [S.V.] on the cheek and mouth.  Rosa stated that [S.V.] told her that [defendant] then told her not to tell anyone about it.  [¶] … [¶]
>
> "Rosa said that she is afraid for her girls' safety from [defendant] and has been sleeping in the girl's room to keep them safe.  [¶] … [¶]
>
> "She stated that she was waiting to confront [defendant] about the kissing instance until her husband, Robert [C.], came back from work in the Bay Area.  [¶] … [¶]
>
> "She stated that she told Robert about kissing and they confronted [defendant] about it today on 11/13 of 2010.  [¶] … [¶]
>
> "Rosa told me that [defendant] became very defensive and upset and began yelling at them, so she contacted law enforcement.  [¶] … [¶]
>
> "Rosa stated that she did not ask [S.V.] additional questions about the kissing incident which occurred about one month ago.  [¶]
>
> "She stated that she feels that [defendant] is a danger to her children and that he needs help."

---

[11]     On cross-examination, Sergeant Avila acknowledged that he asked A.S. if defendant ever made a bad touch on her and her response was "[t]hat he hadn't."

[12]     We will discuss this 2010 police report in further detail in section IV of our Discussion.

17.

Subsequently, Officer Rusche read defendant's statement into the record as follows:

"I then spoke with [defendant]…. [Defendant] stated that two years ago he had pulled his penis out of his pants and rubbed it on [S.V.] He stated that he kissed [S.V.] on the cheek, but denies having kissed her on the mouth. [Defendant] states that he has not done anything else to [S.V.] since the prior incident about two years ago. [¶] … [¶]

"[Defendant] then told me that about a year ago his Uncle Ryan visited and left a porn video. [Defendant] stated that he was watching the porn video for hours and hours a day and getting turned on. He said that one day [S.V.] came in the room while he was watching the video and he initially wanted to tell her to leave, but then he looked at her and then at the females on the video and asked her to stay. [Defendant] said that he then kissed [S.V.] When I asked [defendant] where he kissed [S.V.] he looked away and said, "Uh, on the cheek." I asked [defendant] what else happened and he said, that he heard his mom so he told [S.V.] that she should leave. [¶] … [¶]

"[Defendant] was deceptive when answering my questions. When I asked him specific questions he would look away when answering. [Defendant] did not admit he needs help—excuse me—[defendant] did admit that he needs help because he has sexual urges that are hard to control."

## DISCUSSION

### I. Substantial Evidence Exists to Support the Jury's Verdict as to Counts 2 and 4

Defendant contends "[t]here was insufficient evidence to establish that the oral copulation was accomplished against [A.S.'s] will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (Counts 2 and 4)." We disagree.

#### A. *Additional Factual Background*

Defendant was charged with aggravated sexual assault of A.S., based on oral copulation (§ 269, subd. (a)(4), count 2), and a forcible lewd act upon A.S., based on oral copulation (§ 288, subd. (b)(1), count 4). Counts 2 and 4 further alleged the acts were committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on A.S. and another.

As to count 2, the trial court instructed the jury in relevant part as follows:

18.

"The defendant is charged in Count Two with Aggravated Sexual Assault of a Child ([A.S.]) who was under the age of 14 years and at least seven years younger than the defendant in violation of Penal Code section 269(a).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.    The defendant committed oral copulation by force, fear or threats on [A.S.];

"AND

"2.    When the defendant acted, [A.S.] was under the age of 14 years and was at least seven years younger than the defendant.  [¶] … [¶]

"To prove that the defendant is guilty of Oral Copulation by Force, Fear or Threats, the People must prove that:

"1.    The defendant committed an act of oral copulation with [A.S.];

"2.    [A.S.] did not consent to the act;

"AND

"3.    The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to [A.S.]  [¶] … [¶]

"An act is *accomplished by force* if a person uses enough physical force to overcome the other person's will.

"*Duress* means a direct or implied threat of force, violence, or danger, hardship, or retribution that causes a reasonable person to do[or submit to] something that he or she would not otherwise do[or submit to]. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of [A.S.] and her relationship to the defendant.

"*Menace* means a threat, statement, or act showing an intent to injure [A.S.]

"An act is *accomplished by fear* if the other person is actually and reasonably afraid."  (Italics in original.)

19.

As to count 4, the trial court instructed the jury in relevant part as follows:

"The defendant is charged in Count 4 with a Lewd or Lascivious Act by Force or Fear on a Child under the age of 14 years in violation of Penal Code section 288(b)(1).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.     The defendant willfully caused [A.S.] to orally copulate his penis;

"2.     In committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to [A.S.];

"3.     The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or  [A.S.];

"AND

"4.     [A.S.] was under the age of 14 years at the time of the act.  [¶] … [¶]

"The *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself.

"*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do[or submit to] something that he or she would not otherwise do[or submit to].  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of [A.S.] and her relationship to the hardship, or retribution that causes a reasonable person to do[or submit to] something that he or she would not otherwise do[or submit to].  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of [A.S.] and her relationship to the defendant.

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"An act is accomplished by *fear* if the child is actually and reasonably afraid."  (Italics in original.)

During closing arguments, the prosecutor argued counts 1 through 4 were established through evidence of the final act of penetration and oral copulation that occurred in 2018. Specifically, as to the force, violence, duress, menace, or fear of immediate and unlawful bodily injury elements, the prosecutor argued the following in relevant part:

> "Duress goes into threats of force, violence, or danger. Here we have on that day when [A.S.] told Deputy Pennington that it happened in 2018, that [defendant] had vaginal intercourse by force and then forceful oral copulation. He threatened [A.S.] that if she told anyone he would make life worse for her. [¶] … [¶]

> "So what is some of the facts that you heard in this case that satisfy that element? Well, [A.S.] said that, [defendant] made me suck his dick, when she talked to Deputy Pennington. She testified that she gagged when [d]efendant made her suck his penis. She said that it hurt her when she had to suck the [d]efendant's penis. She said she was scared because she didn't know when it was going to stop. And ultimately the show of force here is when [d]efendant initially put his penis in [A.S.'s] vagina, he put his hand over her mouth, laid on top of her. She tried to push him off, she couldn't. And this force of hand over mouth laying on top of her forcing his penis into her vagina, he then pulls it out and sticks it in her mouth. So it's all sort of one action of force from the rape and then going into the forced oral copulation."

## B.    *Standard of Review*

In reviewing a conviction for substantial evidence, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.) We must view the evidence in the light most favorable to the judgment below, indulging in all presumptions and every logical inference the trier of fact could draw from the evidence (*People v. Carter* (2005) 36 Cal.4th 1114, 1156).

The test is whether substantial evidence supports the jury's conclusion. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–578), not whether the reviewing court would reach the same conclusion (*People v. Crittenden* (1994) 9 Cal.4th 83, 139). Thus, reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) " 'The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable.' " (*People v. Panah* (2005) 35 Cal.4th 395, 489, quoting *People v. Scott* (1978) 21 Cal.3d 284, 296.)

### C.    *Section 269, Subdivision (a)(4) (Count 2)*

#### 1.    Applicable Law

As to count 2, section 269, subdivision (a)(4) states the following:

"(a)  Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child:  [¶] … [¶]

"(4)  Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 287 or former Section 288a."

Section 287, subdivision (c)(2)(A) states the following:

"Any person who commits an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years."

In *People v. Cicero* (1984) 157 Cal.App.3d 465, 474 (*Cicero*), disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 243–248 (*Soto*), the Third District Court of Appeal defined " 'force' " for purposes of lewd acts by force on a child in section 288 as "physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself." In *People v. Griffin* (2004) 33 Cal.4th 1015 (*Griffin*), our Supreme Court considered whether the term "force" as used in

22.

section 261 (rape statute), has the same specialized legal meaning. The *Griffin* court held that "force" has no specialized legal meaning under the rape statute and rejected application of the definition adopted by *Cicero* to forcible rape. (*Griffin*, at pp. 1023–1024.) Rather, the court concluded that "[w]hen two adults engage in *consensual* sexual intercourse, whether with or without physical force greater than that normally required to accomplish an act of sexual intercourse, the forcible rape statute is not implicated. The gravamen of the crime of forcible rape is a sexual penetration *accomplished against the victim's will* by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (*Id*. at p. 1027, italics in original.) The court acknowledged the "Legislature has never sought to circumscribe the nature or type of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction." (*Ibid*.) Therefore, in a rape case, the "question for the jury [is] … simply whether [the] defendant used force to accomplish intercourse with [the victim] against her will, not whether the force he used overcame [the victim's] physical strength or ability to resist him." (*Id*. at p. 1028.) The court found the defendant in *Griffin* used the requisite force because he pinned the victim's arms to the floor as he penetrated her. (*Id*. at p. 1029.)

Subsequently, the Third District Court of Appeal considered how to define "force" for purposes of aggravated sexual assault of a child by forcible oral copulation under section 269. (*People v. Guido* (2005) 125 Cal.App.4th 566 (*Guido*).) The court stated, "As *Griffin* recognized, the term 'force' as used by the Legislature in sexual offense statutes does not have a constant meaning; the meaning changes depending on the crime to which the term is applied." (*Id*. at p. 575.) The court found the *Griffin* reasoning "appl[ies] equally to the crime of forcible oral copulation." (*Guido*, at p. 576.) "As with forcible rape, it is only when one participant in the act uses force to commit the act against the other person's will that an otherwise lawful act becomes unlawful." (*Ibid*.)

23.

The court concluded "there is no reasoned basis to apply a different concept of the term 'force' to forcible rape and forcible oral copulation and we hold oral copulation by force within the meaning of [former] section 288a, subdivision (c)(2) is proven when a jury finds beyond a reasonable doubt that [the] defendant accomplished an act of oral copulation by the use of force sufficient to overcome the victim's will."[13] (*Ibid*.)

## 2. Analysis

Here, there is substantial evidence for a rational jury to find defendant used sufficient force to overcome A.S.'s will to orally copulate her. During this incident, A.S. woke up in the middle of the night with defendant laying on top of her. He placed his hands over A.S.'s mouth and removed both his and her pants. A.S. tried to squirm away, but she could not move and felt "hopeless." Defendant then raped her and A.S. "didn't try to fight him on it … [and she] kind of gave up … on trying to stop him." Subsequently, defendant placed his penis inside her mouth causing A.S. to gag. Defendant's act of placing his penis inside A.S.'s mouth after raping her—without her consent and after multiple attempts to squirm away—is sufficient to sustain a violation of section 269, subdivision (a)(4).

Nonetheless, defendant contends that A.S. "disclaimed the use of force in the commission of oral copulation [because] [t]he force used against her during intercourse—body weight and a hand over her mouth—was no longer a factor." Specifically, defendant argues he "got off of her and she sat up [and] [h]e had one foot on the floor and a knee on the bed when he used his hand to guide his penis into her mouth [and] [t]hat required some positive cooperation on her part." This argument is not persuasive.

---

[13] Specifically, the *Guido* court affirmed the defendant's conviction for a violation of section 269, subdivision (a)(4) when it was determined that the defendant "insisted that [the victim] 'put [his penis] in [her] mouth.' She said she did not want to and that 'it' was nasty so [the] defendant put on a condom and put his penis in her mouth. This caused [the victim] to want to vomit and she ran to the bathroom." (*Guido*, *supra*, 125 Cal.App.4th at p. 571.)

24.

Forcible oral copulation simply necessitates the use of force sufficient to overcome the victim's will. (*Guido*, *supra*, 125 Cal.App.4th at p. 576.) The People were not required to show the use of such force prevented A.S. from physically resisting defendant. (*Ibid*.) " 'Force' includes circumstances where the victim did not want to engage in the act and the evidence does not otherwise establish the victim's positive cooperation in act or attitude." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.) A.S.'s attempt to push defendant off her, along with her repeated attempts to try and squirm away evinced her unwillingness to participate in this act. Accordingly, substantial evidence supports the jury's verdict as to count 2.

### D. *Section 288, Subdivision (b)(1) (Count 4)*

#### 1. **Applicable Law**

As to count 4, section 288, subdivision (b)(1) states the following:

"(b)(1) A person who commits an act described in subdivision (a)[14] by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony and shall be punished by imprisonment in the state prison for 5, 8, or 10 years."

In contrast to the "force" defined in section 269, subdivision (a)(4), for purposes of section 288, subdivision (b)(1), the force applied must be " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*Soto*, *supra*, 51 Cal.4th at p. 242, quoting *Cicero*, *supra*, 157 Cal.App.3d at p. 474.) "This formulation was, and remains, an appropriate definition of the force required for an aggravated lewd conduct conviction under section 288(b), now section 288(b)(1)." (*Soto*, at p. 242.)

---

**14**    Section 288, subdivision (a) states: "[A] person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes … upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

"[T]he force requirement will be deemed satisfied when the defendant uses any force that is 'different from and in excess of the type of force which is used in accomplishing similar lewd acts with a victim's consent.' " (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.)  This includes "acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*Ibid*., citing *People v. Bolander* (1994) 23 Cal.App.4th 155, 160–161 ["[the] defendant's acts of overcoming the victim's resistance to having his pants pulled down, bending the victim over, and pulling the victim's waist towards him" constituted forcible lewd conduct"]; *People v. Neel* (1993) 19 Cal.App.4th 1784, 1790 ["[the] defendant's acts of forcing the victim's head down on his penis when she tried to pull away and grabbing her wrist, placing her hand on his penis, and then 'making it go up and down' "constituted forcible lewd conduct]; *People v. Babcock* (1993) 14 Cal.App.4th 383, 388 [force element met where the defendant grabbed the victims' hands and made them touch his genital area].)

On the other hand, duress means "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50, fn. omitted, disapproved on another ground in *Soto*, *supra*, 51 Cal.4th at p. 248, fn. 12; accord, *People v. Leal* (2004) 33 Cal.4th 999, 1004 ["The term 'duress' as used in section 288, subdivision (b)(1), was first defined in [*Pitmon*]" and "[t]he *Pitmon* definition of 'duress' has been followed consistently for almost 20 years"].)  "The total circumstances, including the age of the victim, and [her] relationship to [the] defendant are factors to be considered in appraising the existence of duress." (*Pitmon*, at p. 51.)  Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family. (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.)

## 2.    Analysis

As to an allegation of a forcible lewd act upon a child by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury, only *one* of these means are required to sustain a conviction. (§ 288, subdivision (b)(1) [the terms "force, violence, duress, menace, *or* fear of immediate and unlawful bodily injury" are used in the disjunctive], italics added.) Here, defendant argues there is insufficient evidence supporting the "force" element for a forcible lewd act because "[t]he act of guiding his penis into [A.S.'s] open mouth was not substantially different from or substantially greater than that necessary to accomplish the lewd act itself." We do agree the evidence supporting force that is " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself' "—i.e., the oral copulation—is thin. (*Soto*, *supra*, 51 Cal.4th at p. 242.) However, as we discuss in detail below, substantial evidence exists to support the jury's finding the forcible lewd act offense in count 4 was a product of "duress." Further, the prosecutor argued during closing arguments defendant used *both* "force" and "duress" in committing a forcible lewd act upon A.S.

Here, there was substantial evidence defendant committed the lewd act in violation of section 288, subdivision (b)(1). Specifically, as it relates to count 4, there was substantial evidence defendant subjected A.S. to several psychological pressures. First, defendant was A.S.'s older brother, he was 10 years older, and was much bigger in size. Defendant possessed authority over A.S. and specifically testified he would try and discipline A.S. for bad behavior. (See *People v. Senior*, *supra*, 3 Cal.App.4th at p. 775 [" 'Where the defendant is a family member and the victim is young, … the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress."].) Second, A.S.'s entire support structure failed her during her time of need, which added to the duress of the situation. A.S.'s mother, Rosa, testified she did not believe the accusations made by A.S. and that A.S. lied about all the assaults. A.S. also became aware her former sister-in-law, Nicole, was a victim of

27.

sexual assault; she attempted to confide in her. However, Nicole testified she completely disregarded A.S.'s accusations made against defendant, she observed nothing unusual between A.S. and defendant, and further testified the two of them had a normal sibling relationship. Eventually, A.S. realized no one within her family believed her. Defendant used this lack of familial support to his advantage. A.S. testified she repeatedly told Rosa about the abuse; however, Rosa disregarded those accusations and continued to side with her son, defendant. At some point during this seven-year period, defendant realized he had the absolute freedom to continuously abuse A.S. without repercussions.

This record paints a grim picture of a small, vulnerable, and isolated child who repeatedly engaged in these sex acts only in response to fear of retribution from her family. This ever-present fear of punishment hung over A.S.'s life and discouraged her from disclosing sooner. Under these circumstances, given the age and size of A.S., her relationship to defendant, and the implicit threat she would break up the family if she did not comply, the evidence supports a finding of duress. Accordingly, substantial evidence supports the jury's verdict as to count 4.

## II. The Trial Court Did Not Have a Sua Sponte Duty to Instruct the Jury on the Lesser Included Offenses of Counts 1 and 2

Further, defendant contends that "[b]ecause the evidence supporting the element of force was questionable as to Counts 1 and 2, the court was required to instruct sua sponte on lesser included offenses that did not involve the use of force." (Italics omitted.) We again disagree.

### A. Additional Factual Background

Prior to closing arguments, the trial court, prosecutor, and trial counsel had an informal jury instruction conference that is not in the record. However, as to counts 3 and 4, the following brief discussion occurred between the trial court and trial counsel:

"[TRIAL] COURT: Also I guess since we are on the record, the Court is not instructing as to Counts 3 and 4, the lesser of Penal Code section

28.

288(a), and defense counsel indicated that would be their request for tactical and/or strategic reasons; is that correct?

"[TRIAL COUNSEL]:   That's correct, Your Honor."

The record is void of any discussions that occurred regarding the need for lesser included offenses as to counts 1 and 2.

### B.      General Legal Principles

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "[A] lesser included instruction need not be given when there is no evidence that the offense is less than that charged." (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

"To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test. 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404.)

"On appeal, we independently review whether a trial court erroneously failed to instruct on a lesser included offense." (*People v. Trujeque* (2015) 61 Cal.4th 227, 271.)

### C. Section 261.5, Subdivision (c) (Lesser-Included Offense of Count 1)

#### 1. Applicable Law

Section 269, subdivision (a)(1) (aggravated sexual assault of a child) states the following:

> "(a) Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child:
>
> "(1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261."[15]

On the other hand, section 261.5, subdivisions (a) and (c) (unlawful sexual intercourse with person under 18), states the following in relevant part:

> "(a) Unlawful sexual intercourse is an act of sexual intercourse accomplished with a person who is not the spouse of the perpetrator, if the person is a minor. For the purposes of this section, a 'minor' is a person under 18 years of age and an 'adult' is a person who is 18 years of age or older. [¶] … [¶]
>
> "(c) A person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty of either a misdemeanor or a felony …."

#### 2. Analysis

At the outset, it appears both parties agree that section 261.5, subdivision (c), is a lesser included offense of section 269, subdivision (a)(1). Irrespective of the parties' apparent agreement, we find that under the elements test, a violation of section 261.5, subdivision (c), is a lesser included offense of section 269, subdivision (a)(1).

To violate section 269, subdivision (a)(1), a defendant must forcibly rape a child who is under 14 years of age and seven years or more younger than the defendant.

---

[15]  Section 261, subdivision (a)(2), states the following: "(a) Rape is an act of sexual intercourse accomplished under any of the following circumstances: [¶] … [¶] (2) If it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

(§§ 269, subd. (a)(1), 261, subd. (a)(2); CALCRIM Nos. 1000, 1123.) To violate section 261.5, subdivision (c), a defendant must have sexual intercourse with a minor who is more than three years younger than the defendant. (§ 261.5, subd. (c); CALCRIM No. 1071.) A defendant cannot forcibly rape a child under the age of 14 and seven years or more younger without also having sexual intercourse with a minor three years or younger. Therefore, section 261.5, subdivision (c), is a lesser included offense of section 269, subdivision (a)(1). (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197 ["Under the elements test, one offense is another's 'lesser included' counterpart if all the elements of the lesser offense are also elements of the greater offense."], italics omitted.)

A trial court is obligated to "giv[e] instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*), disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) It is the threat of force, use of force, or duress that differentiates section 269, subdivision (a) from section 261.5, subdivision (c). Section 269, subdivision (a)(1), requires the People to prove the intercourse was "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" to the victim. (§§ 261, subd. (a)(2), 269, subd. (a)(1); CALCRIM Nos. 1000, 1123.) Section 261.5, subdivision (c), contains no such requirement.

Therefore, a defendant is entitled to an instruction on section 261.5, subdivision (c), *only* if there is sufficient evidence such that a juror could conclude the defendant had sexual intercourse with the minor victim but did not use force to do so.

Under section 269, "[t]he amount of force required is simply the 'use of force sufficient to overcome the victim's will.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 728.) This definition is indistinguishable from the "force" required to sustain a conviction for a violation of section 269, subdivision (a)(4), as previously discussed *ante*,

31.

in section I, subdivision C, of the Discussion. Accordingly, there lacks sufficient evidence to conclude a juror would have found defendant to have engaged in sexual intercourse with A.S. *without* the use of force.

However, even assuming the trial court erred in not instructing the jury with the lesser included offense of section 261.5, subdivision (c), any presumed error was not prejudicial. (*Breverman*, *supra*, 19 Cal.4th at p. 149 [In general, failure to instruct on a lesser included offense is an error of state law, and error is harmless "unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred."]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) "Appellate review under *Watson* … focuses not on what a reasonable jury could do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman*, at p. 177, italics omitted.)

Under *Watson*, given the low bar for what constitutes "force" for purposes of section 269, subdivision (a)(1), there was more than enough evidence to allow a juror to conclude defendant used force to overcome A.S.'s will. Therefore, it is not reasonably probable the jury would have concluded defendant was guilty of only the lesser crime, given the strong evidence of force. During the 2018 rape—the basis for the aggravated sexual assault conviction—A.S. testified she woke up in the middle of the night and found defendant on top of her. Defendant then placed his hand over A.S.'s mouth and continued to use his weight to keep her from squirming away. At one point, defendant held down A.S.'s legs in an uncomfortable position and proceeded to rape her. Any of these three acts alone—the hand over the mouth, the use of body weight, and the placing

of A.S.'s legs in an uncomfortable position—was sufficient to conclude defendant used force to rape A.S.

Nonetheless, defendant argues "there was sufficient evidence to raise a reasonable doubt as to whether sexual intercourse was accomplished by means of force, fear, or duress" because A.S.'s veracity was at issue throughout the trial and her trial testimony was full of conflicting statements. However, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Unless he or she describes facts or events that are "physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Accordingly, A.S.'s testimony alone regarding the forcible rape was sufficient to support the jury's verdict as to count 1.

Furthermore, the People introduced evidence of defendant's prior sexual conduct pursuant to Evidence Code section 1108.[16] The jury heard numerous pieces of evidence surrounding defendant's repeated sexual abuse of A.S. between 2011 and 2018. This propensity evidence provided corroborating evidence of the underlying charges. First, during the 2018 biting incident, A.S.'s cousin, her brother, M.S., her sisters, S.V. and E.S., all observed A.S.'s bruised lip as a result of defendant's abuse. Second, S.V. testified defendant sexually assaulted her at the Fresno house when she was between the ages of eight and 13. These assaults included both digital penetration and oral copulation with the use of force—specifically, defendant's hand over S.V.'s mouth. Finally, Rosa was

---

[16] Evidence Code section 1108, subdivision (a) states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

aware of defendant's sexual predisposition, and defendant himself told Deputy Rusche "he need[ed] help because he ha[d] sexual urges that are hard to control." Accordingly, in light of the overwhelming corroborating evidence in support of A.S.'s testimony, even if we assume the trial court erred in not instructing the jury with the lesser included offense of section 261.5, subdivision (a), it is not reasonably probable a juror would have concluded defendant was guilty of only the lesser crime.

### D. Section 287, Subdivision (b)(1) (Lesser Included Offense of Count 2)

#### 1. Applicable Law

As stated above, section 269, subdivision (a)(4), states the following:

> "(a) Any person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child: [¶] … [¶]

> "(4) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 287 or former Section 288a."

On the other hand, section 287, subdivision (b)(1), states the following:

> "Except as provided in Section 288, any person who participates in an act of oral copulation with another person who is under 18 years of age shall be punished by imprisonment in the state prison, or in a county jail for a period of not more than one year."

#### 2. Analysis

Again, at the outset, it appears both parties agree that section 287, subdivision (b)(1), is a lesser included offense of section 269, subdivision (a)(4). Irrespective of the parties' apparent agreement, we find that under the elements test, a violation of section 287, subdivision (b)(1), is a lesser included offense of section 269, subdivision (a)(4).

To violate section 269, subdivision (a)(4), a defendant must forcibly orally copulate a child who is under 14 years of age and seven years or more younger than the defendant. (§§ 269, subd. (a)(4), 287, subd. (c)(2)(A); CALCRIM Nos. 1015, 1123.) To

34.

violate section 287, subdivision (b)(1), a defendant must have orally copulated a person who is under the age of 18 years of age.  (§ 287, subd. (b)(1); CALCRIM No. 1082.)  Similar to our previous discussion in section II, subdivision (C) of the Discussion, a defendant cannot forcibly orally copulate a child under the age of 14 and seven years or more younger without also orally copulating with a person who is under the age of 18 years of age.  Therefore, section 287, subdivision (b)(1), is a lesser included offense of section 269, subdivision (a)(4).  (*People v. Gonzalez*, *supra*, 5 Cal.5th at p. 197.)

As previously discussed *ante* in section I, subdivision (C), of the Discussion, substantial evidence exists to support the jury's finding that defendant used force, violence, duress, menace, or fear of immediate and unlawful injury to orally copulate A.S.  The only "force" required is force sufficient to overcome the victim's will.  (*Guido*, *supra*, 125 Cal.App.4th at p. 576.)  " 'Force' includes circumstances where the victim did not want to engage in the act and the evidence does not otherwise establish the victim's positive cooperation in act or attitude."  (*People v. Thomas*, *supra*, 15 Cal.App.5th at p. 1071.)  Again, A.S.'s attempt to push defendant off her, along with her attempts to squirm away demonstrate her unwillingness to participate in the act.  Accordingly, the trial court had no sua sponte duty to instruct the jury with the lesser included offense of section 287, subdivision (b)(1), because there was no evidence the offense was less than the greater charged offense of section 269, subdivision (a)(4).  (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 174.)

## III.    CSAAS Expert Testimony

Defendant further contends it was improper for the CSAAS expert David Love to testify the "CSAAS doctrine prohibits jurors from considering the demeanor of a complaining witness giving testimony from the stand" and his "discussion of 'unconvincing disclosure,' when applied to the trial testimony of the complaining witness, had the effect of undermining the standard of proving guilt beyond a reasonable

doubt." Additionally, defendant contends Love gave improper profile testimony regarding "grooming."

In response, the Attorney General contends defendant's "claims regarding victim credibility and alleged 'profile' testimony are forfeited" because trial counsel failed to make "[a] specific objection … to allow the court to make an informed ruling on the objection and to allow the party proffering the evidence to cure any defect." We agree. (See *People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*) [" ' "[D]efendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable' "].) However, to avoid the forfeiture doctrine, defendant alternatively contends he received ineffective assistance of counsel when trial counsel failed to object to Love's testimony regarding both a child sexual assault victim's demeanor and "grooming." As we discuss in detail below, because trial counsel had a tactical reason for not objecting to the evidence, we conclude defendant did not receive ineffective assistance of counsel.

### A.     *Additional Factual Background*

Prior to trial, trial counsel filed a motion in limine to exclude "[t]he testimony of David Love, MFT, regarding [CSAAS] … in its entirety." (Emphasis omitted.) Trial counsel argued the testimony should be excluded in its entirety, but "[i]f the Court allows Mr. Love to testify, the testimony should be limited in accordance with the rules of evidence and current law." Specifically, "Mr. Love should only be permitted to testify about delayed disclosure, the sole symptom of CSAAS that has thus far withstood scientific scrutiny."

At the motions in limine hearing, the trial court indicated its familiarity with Love. Subsequently, trial counsel argued the following:

> "… As the Court noted, my biggest fear is that [Mr. Love] will start getting into statistics and just as the Court noted, sometimes those static presentations could be misleading to the jury. I would echo the Court's remarks with respect to speaking in more general terms. I even went

36.

further in my motions on precluding Mr. Love from testifying, using words such as the vast majority of and such, because it's [*sic*] gives an unfair characterization of the area of study. I believe that will have a prejudicial effect on my client. Additionally, I'm concerned that Mr. Love will try to make certain hypotheticals of a—to profile a pedophile or predator. And any hypothetical he may draw, the jury will be looking at [defendant] and [defendant] only. I think that's inappropriate. As I stated in my motion, I have no qualms with Mr. Love testifying to late reporting. As I stated in my motion, that's common with respect to sexual offenses. My concern is just bolstering his credibility by adding statistics and language that would suggest that in every case of a reporting that means that something may have happened. I again would urge the Court to instruct Mr. Love to testify in general terms only.

"And then two other little areas I wish we could preclude here, and that's any reference to Mr. Love being a helicopter pilot, and reference to Mr. Love in his military background. I don't think that has any relevance or anything to do with this case or his expertise."

As to Love's testimony, the trial court ruled as follows:

"And let's move on real quick to Mr. Love's testimony. Both the Parties have addressed it in their trial briefs. Just a couple of comments and then I'll hear from counsel. First of all, as perhaps suggested, it is not necessary that Mr. Love be a doctor. There is no requirement for expert testimony that the person have any specific set of qualifications. He is not a doctor. I will tell you candidly I've allowed him to testify in this court before. I find his qualifications sufficient to discuss [CSAAS]. Generally I intend to once allow that testimony. As both have pointed out, both parties, generally that subject matter involves five subcategories, Secrecy, Helplessness, Entrapment, Delayed Disclosure and Recanting. When we talk about those things generally since [E.S.'s] not testifying, I don't see recanting as being an issue, so I think that one pretty much goes away.

"Delayed disclosure, even though defense is objecting to Mr. Love, essentially acknowledge that that would be something that would be useful with jurors. I'm going to allow him to discuss delayed disclosure, and to a degree secrecy. They kind of go hand in hand. One of the things that I would ask as the defense has, is that Mr. Love wants to discuss things statistically, statistically X percent of allegations are false allegations. I don't really want to get into the statistics. Because even the way—even if they are accurate, sometimes the way they are phrased are misleading. I think [trial counsel] kind of laid that out when he said, Well, within five years 40 percent of delayed, and ten years 60 percent. I can't remember

how you worded it but, yeah, wait a minute, that's not exactly what that means.  So I think maybe we need to have a few minutes with Mr. Love just to tell him that I think it would be frankly okay for him to say that many children delay reporting, it's not uncommon, and often there are reasons for that.  And I think they are laid out by the People.  Maybe, [trial counsel], that you know it's family members so they have conflicted feelings.  They don't want to have their siblings or parents in trouble.  So just in general terms, I'm okay with it.  But he wants to often go a little further than that.  So you just need to give him the right parameters."

At trial, Dr. Love explained the CSAAS's secrecy component in relevant part as follows:

> "[PROSECUTOR]:    Can you please tell us the basics of Secrecy as the first stage?

> "[LOVE]:    Sure.  And that's why it's number one.  And the first thing that became very obvious is, why the heck aren't kids coming and telling us this, you know?  Then it's really upsetting to parents when we did therapy, it was really confusing when a child has been molested by someone doesn't come forth and tell a caretaker or a grandparent or a teacher or somebody.  Why aren't they telling?  And some people raised the issue, Well, if they aren't telling maybe it didn't happen.  And we were trying to sort of look at that, and that's what Summit [author of original article on CSAAS] wanted to probe into.  So [he] looked at some of the elements that lead to that dynamic: A, sexual abuse is a huge taboo in our society.  People are uncomfortable talking about it.  Children, when we treat them, feel often guilty themselves and feel like they did something wrong, because they did, they were sexually involved, and kids aren't supposed to do that even though they were victimized in this particular dynamic not at their choice, so they feel ashamed.  And if I'm ashamed of myself or something that I've done, why would I tell anybody else?  And so that became really dynamic.

> "We also have to remember that when children are molested, the person who chooses to molest them understands the dynamics of our culture.  In other words, they've got to find a child they can get access to, a child that they believe will probably not disclose, otherwise they are going to get caught and the consequences are pretty dramatic, and a way in which they could get the child to cooperate in some form or another, meaning keep the secrets in some form or another.  And when Summit looked at this, and Dr. Briere [another researcher] particularly looked at this, found that there was really two categories of ways the secret seemed to get sort of

38.

continued, A, was coercion. In other words, they said, You know, if you tell, there's nobody to put food on the table anymore, there is nobody to pay the rent, or nobody will believe you, or they will think you are a terrible person. Look, look at who I am and you child, why would they believe you over me? So they use this to keep the child quiet, to keep the secret. Or it may be bribery, the other side of the coin, but—you know, I'll buy us some nice clothes, new tennies, or we can go have fun together, we can do some good things. So they are basically bribing the child.

"We have to remember that [CSAAS] is very different than rape. This is not grabbing someone and assaulting them, this is a period of time in which multiple things take place over time that leads to and may continue to be involved in this set of molest events that are happening to this child. So we looked at those strategies—

"[TRIAL COUNSEL]:     Objection. Narrative.

"[TRIAL] COURT:     Overruled. Go ahead and finish.

"[LOVE]:     And each of those elements actually in the field of Psychology we've come up with a psychological term for that, it's called Grooming, Grooming. So basically Summit was initially saying, and other researchers were adding, is that—so the first interaction normally is not very significant, maybe some playing and wrestling around and happen to maybe accidentally touch their genitals, maybe helping someone take a bath, maybe helping and playing with someone in a ways. And when you do something that's a little uncomfortable or unusual people get used to it after a little while. So now if you do something that's a little more unusual, maybe putting a hand under a shirt or blouse or something, it's only a little different. In other words, we are building up a comfort level, or at least lowering the distress level. And keeping in mind in sexual abuse—all sexual abuse doesn't end up with oral, anal, vaginal sex, it may be lots of other inappropriate sexual contact, behaviors, interactions. And what we've seen is that if a child reaches a level where their distress becomes more apparent, normally that's about where it stops. On the other hand, if this process continues over time, particularly if the child is a little older, it may go on to more explicit and encompassing sexual interactions. And so basically the bottom line was, you have to have an accessible child that's vulnerable in some way, that can be somehow or another coerced or coaxed or bribed into not telling what's going on for extended periods of time. I've had clients who have kept the secret for multiple years."

39.

Love then described the concepts of helplessness and entrapment, and offered an extended explanation of why victims of abuse may inconsistently describe trauma. Finally, as to the factor of delayed, conflicting and unconvincing disclosure, Love testified to the following relevant information:

> "Now [Dr. Lisak (another researcher)] said one other thing you need to look at is that we do multiple interviews of children each time trying to elicit information. So when I file a CPS report, my agency files five or six a month. A CPS worker, law enforcement officer, will go out and do an interview. If he or she has information that seems to be at all important, that will get referred on. It's not unusual in most counties that they will then be interviewed at what's called the multi-disciplinary interviewing center, or MDIC, or forensic interview center. There they will be interviewed by a highly trained and often certified forensic's interviewer, who go through a standardized training we've now conducted. I've actually been through the course myself. I'm not a forensic interviewer, but in my field of teaching I chose to go through the training. And they are in a situation, in an environment, often we use one-way mirrors and we record this information. And the interviewers there is to try and not contaminate information, elicit information, make the child comfortable enough so they can explain what's happened in a way that they don't feel threatened or overwhelmed. But obviously between the first interview, which is not always by a full-trained professional in a pretty scary situation, and the second they are going to have different information. As Lisak said, you are going to have different information over multiple interviews. And we also have what's called the Rehearsal Effect. When I tell you a story about what happened to me, I'll probably say to myself, I forgot to tell them about that, because it triggers memory. So we'll see new information come out that wasn't in interview one or two. And then we complete the interview process. And that's kind of a little bit of a what I view as a psychologist-type therapist, is a forensic system. They have to sit where I am. So now the child gets interviewed here. And Summit talked about that. And Lisak and others have looked at this carefully. We are asking a child in front of strangers to talk about scary, sexual, embarrassing stuff. We are asking them to do it in front of a person they accused of doing things to them. And so the interview on the stand may well be missing information that they got at the MDIC. The child may be confused or may freeze up a little bit, not want to talk about certain things because it's so gosh darn embarrassing. And the other piece, the last piece of this, is that we've got to be careful not to judge how they act, meaning do they cry, do they laugh, do they freeze up? All of these kinds of things are—could be trauma and stress related to

this very difficult event we are putting them through, interviewing them where we are sitting. And just to be able to understand that in context or when we are trying to listen to what they are having to say."

At this point, the trial court held an unreported sidebar conference. Love did not testify further about unconvincing disclosure.

During cross-examination, trial counsel and Love had the following relevant exchange:

"[TRIAL COUNSEL]: And I just kind of wanted to clarify something that you said, and I'm not sure if this falls under this last factor that we've been talking about, the delayed or Unconvincing Disclosure, but you mentioned a last piece and that was, Don't judge how they act on the stand, whether they laugh or cry. Where did that fall under? Did that fall under a category, or was that all under CSAAS?

"[LOVE]: Unconvincing disclosure. What Summit said and I wanted to say is we have this preconceived notion sometimes that a molested child will be horribly uncomfortable, would cry, would show a lot of grief and stress. And it's just not true, some of them will giggle and laugh, 'cause that's how they cope with the feelings they are having. Roland says don't judge, listen, because there's a range of behaviors a molested child might exhibit in this particular situation sitting on the stand. That's—it was that simple.

"[TRIAL COUNSEL]: Well, does the demeanor of the child while testifying mean anything at all? I mean if it doesn't matter if they are crying and it doesn't matter if they are laughing, does their demeanor mean anything at all?

"[LOVE]: We are saying don't use that to judge, you can't. It doesn't—it's not something that predicts anything. It's just that child's particular characteristic in this particular scenario unrelated to other things. In other words, it doesn't predict, you can't judge it and come to a conclusion is what they were saying.

"[TRIAL COUNSEL]: Does the demeanor of the child testifying have anything to do with their testimony?

"[LOVE]: It has to do with their emotional state.

"[TRIAL COUNSEL]: At the time of testifying?

41.

"[LOVE]:     Yup, 'cause this is not a very easy thing to do for people.

"[TRIAL COUNSEL]:     Like for instance as you testified just now you seem to laugh a little bit.  Does that indicate that you are uncomfortable or nervous?

"[LOVE]:     No, it happens to indicate I found it a little interesting, but that's just me as a strange person."

Subsequently, the trial court instructed the jury with CALCRIM No. 1193, as follows:

"You have heard testimony from David Love regarding child sexual abuse accommodation syndrome.

"Mr. Love's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not [A.S.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

### B.     *Standard of Review*

"The standard for showing ineffective assistance of counsel is well settled.  'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [(*Strickland*)]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.)  A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  [The] defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  (*Strickland*[,] at p. 687; [citation].)  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of

ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' [Citation.] 'Failure to object rarely constitutes constitutionally ineffective legal representation.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206–207.)

"The decision whether to object to evidence at trial is a matter of tactics and, because of the deference accorded such decisions on appeal, will seldom establish that counsel was incompetent." (*People v. Lucas* (1995) 12 Cal.4th 415, 444.) "[T]he mere fact that counsel, had he chosen another path, 'might' have convinced the court to issue a favorable evidentiary ruling, is not enough to carry [the] defendant's burden on demonstrating [incompetence] …." (*People v. Jennings* (1991) 53 Cal.3d 334, 379.)

### C. General Legal Principles

"While CSAAS evidence is not relevant to prove the alleged sexual assault occurred," California courts have long held such evidence admissible in child sexual abuse cases to "disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) Such evidence is needed " 'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*); see *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*) ["The purpose of CSAAS is to understand a child's reactions when they have been abused."].) California courts have held that expert testimony regarding CSAAS "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, at p. 1300; see *Gonzales*, at p. 503.) Thus, "it is well established in California law [that] CSAAS evidence is relevant for the limited

43.

purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, at p. 171.)

"However, pursuit of that laudable rehabilitative purpose must not lead the expert to cross over into affirmatively vouching for the truthfulness of a complainant's allegations against a defendant." (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479–480 (*Sedano*); see *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [expert must not vouch for the veracity of the alleged victims]; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 [" 'The expert is not allowed to give an opinion on whether a witness is telling the truth ….' "].) A CSAAS expert also "may not give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885.) The CSAAS expert's testimony cannot "invade[] the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' " (*People v. Wilson* (2019) 33 Cal.App.5th 559, 570; *People v. Sanchez* (2019) 7 Cal.5th 14, 46 [" 'The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful.' "].) Overall, the testimony must respect the " ' "fine but essential" line between an "opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning defendant's legal guilt." ' " (*Julian*, at p. 887.)

### D.     *Analysis*

#### 1.     <u>Unconvincing Disclosure Testimony</u>

Here, trial counsel was not ineffective for failing to object to portions of Love's testimony regarding unconvincing disclosure because the testimony itself was proper and admissible. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 934 ["The failure to object

to admissible evidence does not constitute ineffective assistance of counsel when to do so would have been futile."].) Love testified that people have a "preconceived notion … that a molested child will be horribly uncomfortable, would cry, would show a lot of grief and stress [a]nd it's just not true, some of them will giggle and laugh, 'cause that's how they cope with the feelings they are having." He informed the jury to not "judge," but "listen, because there's a range of behaviors a molested child might exhibit in this particular situation sitting on the stand." Trial counsel then asked Love, "Well, does the demeanor of the child while testifying mean anything at all? I mean if it doesn't matter if they are crying and it doesn't matter if they are laughing, does their demeanor mean anything at all?" Love replied, "We are saying don't use that to judge … [i]n other words, it doesn't predict, you can't judge it and come to a conclusion is what they were saying."

Love's testimony aimed to "dispel[] commonly held myths or misconceptions about child sexual abuse and aid[] the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' " (*Sedano*, *supra*, 88 Cal.App.5th at p. 479.) He never told the jury to abandon their responsibility to evaluate A.S.'s credibility, but rather he informed the jury that although they may hold a "preconceived notion" on how a child victim of sexual abuse should react, the reality is that child victims exhibit a wide "range of behaviors"—including both laughter and crying. Specifically, he told the jury to not "judge, [but] *listen*, because there's a range of behaviors a molested child might exhibit in this particular situation sitting on the stand." (Italics added.) Love simply told the jury to be attentive and listen carefully to the child victim's testimony, which is exactly what society expects from jurors. Overall, Love's testimony was proper because all he told the jury to do is not discredit a child victim's testimony based on this unusual behavior, which is the underlying purpose behind CSAAS evidence. (*Sedano*, at p. 479.) Accordingly, trial counsel was not ineffective for failing to object to this testimony. (*People v. Ferraez*, *supra*, 112 Cal.App.4th at p. 934.)

45.

## 2. "Grooming" Testimony

However, as to the "grooming" testimony, we agree with defendant this "profile" testimony was improper. Love testified about grooming as a part of the secrecy aspect of CSAAS, but testified only about a child *abuser* using grooming to gain a child's trust. Specifically, he talked about the abuser using progressive touching to eventually reach a point "to more explicit and encompassing sexual interactions." CSAAS is admissible " 'not to prove abuse but to assist in understanding and treating abused *children*.' " (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069, italics added, quoting *People v. Stark* (1989) 213 Cal.App.3d 107, 116.) CSAAS evidence is focused on considering the behavior of child sexual assault victims and is unconcerned with the abuser's behavior. Therefore, Love's testimony regarding a child abuser's use of "grooming" to gain the child's trust over time did not constitute proper CSAAS evidence.

### a. Trial Counsel was not Ineffective

Although Love's "grooming" testimony was improper, we are unable to say trial counsel was ineffective for not objecting to this evidence because he had a tactical purpose for not objecting. (*People v. Lucas*, *supra*, 12 Cal.4th at p. 444.) Contrary to defendant's argument, trial counsel tactically challenged Love's testimony and the validity behind CSAAS evidence during his thorough cross-examination. (*People v. Cleveland* (2004) 32 Cal.4th 704, 746 ["normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make"].) Rather than focus the jury's attention on this inadmissible evidence (see *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["counsel could also have decided that objecting would focus the jury's attention … in ways that would not be helpful to the defense"]; *People v. Ghent* (1987) 43 Cal.3d 739, 773 [holding that although defense counsel failed to object to the prosecutor's personal opinion regarding the appropriateness of the death penalty in the case, ineffective assistance counsel was not found because "[c]ounsel may well have tactically assumed that an objection or

46.

request for admonition would simply draw closer attention to the prosecutor's isolated comments"]), trial counsel utilized cross-examination and closing arguments to argue CSAAS is not a credible tool for analyzing child sexual abuse. Specifically, trial counsel argued the following:

"Now, the DA has already spoken about … CSAAS. Junk science. I can't be any more direct. And when speaking to Mr. Love on the stand he agreed with me, it's not a syndrome. Down syndrome is a syndrome. Post-Traumatic Stress Syndrome/Disorder is a diagnostic tool. Why not have [A.S] diagnosed for PTSD and have expert talk about that? Because she's lying. Make no mistake, Ladies and Gentlemen, it is difficult to stand up here before you and call a 13-year old a liar. But you've heard the evidence. What other conclusion can you draw? With respect to CSAAS, it's not a diagnostic tool, it's a pattern. And it's not based [o]n science. It was a result of a clinical study which studied nothing but children that were molested. I've got an idea, I'll come up with my own syndrome, it's called Drunk Person Syndrome, and I will have a scientific study got [*sic*] you. Here's what we'll do, we will follow the scientific method and have what's called a control group and we'll study drunk people, these people won't drink, and we will test every one and come to a conclusion. That's scientific. That's control. But when you are basing a diagnostic pattern, if you will, on nothing but children who have been molested, how can you possibly tell if there is any false disclosures? Because under Mr. Love's recitation of CSAAS, there's a variety of components that all point to CSAAS. You can have one, you can have four. Did they disclose early? Did they disclose late? All point to the same thing. Are they in secret CSAAS? Do they feel helpless CSAAS? What child living with their parents don't feel entrapped at home? Not many children have much options to move out at 13-years old. CSAAS is redundant. It shouldn't be used in criminal trials for the very reason it's confusing you in patterning these events as a victim of child molestation."

Trial counsel's cross-examination of Love, coupled with his subsequent closing argument in which he attempted to tear apart the fabric of the CSAAS framework, demonstrated an attorney who fought hard for his client and advocated on his client's behalf to the best of his ability. Accordingly, trial counsel's tactical decision to not object to Love's testimony did not constitute ineffective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at p. 694.)

47.

### b. Prejudice

Nonetheless, even if we assume trial counsel's decision to not object to Love's testimony constituted ineffective assistance of counsel, defendant is still unable to establish prejudice, i.e., a " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 833, disapproved on another ground in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 854, fn. 5.)[17]

The jury was properly instructed they "alone must judge the credibility or believability of witnesses" (CALCRIM No. 226); they "must consider the [expert] opinion, but … are not required to accept it as true or correct" (CACLRIM No. 332); and that "Mr. Love's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him" (CALCRIM No. 1193).[18] Finally, and most

---

[17]    Defendant further argues "the erroneous admission of CSAAS testimony … undermined [his] constitutional rights of confrontation and due process," and thus urges this court to apply the prejudicial standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), which requires the People to prove the error was harmless beyond a reasonable doubt. (*Id*. at p. 24.) However, "reviewing courts have routinely held the admission of CSAAS evidence does not violate due process. (See, e.g., *People v. Patino* [(1994)] 26 Cal.App.4th 1737, 1744–1745 [a trial court's admission of CSAAS evidence did not violate due process]; see also *Amaya v. Frauenheim* (9th Cir. 2020) 823 Fed.Appx. 503, 505 [California court's ruling that the admission of CSAAS evidence did not violate federal due process was not contrary to, or an unreasonable application of, clearly established federal law].)" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

[18]    Defendant further argues "CALCRIM No. 1193 allowed the jury to apply CSAAS in evaluating the child's believability [and] [t]he combined effect of the CSAAS testimony and [the instruction] was to eliminate [his] constitutional right to have the jury consider demeanor in evaluating the accusations of an accuser." This argument is without merit. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 175 [agreeing with opinions holding that CALCRIM No. 1193 "does not … violate due process" or "misapply the burden of proof"].) We discuss CALCRIM No. 1193 in further detail in section VII of the Discussion.

48.

importantly, the jury was instructed "[a] defendant in a criminal case is presumed to be innocent [and] [t]his presumption requires that the People prove a defendant guilty beyond a reasonable doubt" (CALCRIM No. 220). " '[B]ecause we presume jurors understand and correlate all of the instructions' [citation] and the jurors are 'presumed to have followed the court's instructions' " (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1256), we are unable to say the jury misapplied Love's testimony. Given the limited purpose for which Love's testimony was offered, it is unlikely defendant would have received a more favorable outcome had trial counsel objected.

## IV. The Trial Court Did Not Abuse its Discretion in Admitting Rosa and Defendant's Statements Reflected in the 2010 Police Report

Defendant further contends the trial court prejudicially erred when it permitted testimony about a 2010 police report. Specifically, defendant argues the trial court abused its discretion when it: (1) "permit[ted] evidence relating to an alleged sexual assault of [S.V.] in San Diego"; (2) "admit[ted] [his] 2010 statement about watching porn at the age of 13 and kissing [S.V.] on the cheek"; (3) "admit[ted] [his] 2010 remark about having sexual urges"; (4) "admit[ted] hearsay attributable to [S.V.]"; and (5) "admit[ted] improper lay opinions." (Capitalization and emphasis omitted.) As to each individual argument, we disagree.

### A. Additional Factual Background

Prior to the trial, the following relevant exchange occurred between the trial court and trial counsel regarding the 2010 police report:

> "[TRIAL COUNSEL]: … However, [defendant's] statements at the time, I do not believe fall within [Evidence Code section] 1108. As stated by the Court, I think it could potentially be impeachment evidence, but I don't believe that statement should come in under [Evidence Code section] 1108 as that statement he's not talking about any sexual abuse conduct. He's talking about his predilections or urges.

> "[TRIAL] COURT:    Okay. Assuming I agree with you in that regard, he also, according to this police report, stated to the detective, and

49.

I'll quote now: I read [defendant's] *Miranda*[19] warnings. [Defendant] stated yes when asked if he understood in speaking with me, blah, blah. [Defendant] stated about two years ago he had pulled his penis out of his pants and rubbed it on [S.V.]… He stated that he kisses [S.V.] on the cheek, but denies having kissed her on the mouth. [Defendant] stated he has not done anything else to [S.V.] since the prior incident about two years ago. So even if we exclude his—well, I think about girls in that way kind of comment, what about the fact that he said he pulled his penis out of his pants and rubbed it on [S.V.]?

"[TRIAL COUNSEL]: I'll leave that to the People and the Court.

"[TRIAL] COURT: Okay. If this was a boxing match it would be a split decision, because I will allow that statement, his admission to that conduct, but I will exclude at least in People's Case in Chief his statement about.… These are the words: [Defendant] did admit he needs help because he has sexual urges that are hard to control. So Case in Chief, that's out. The allegations towards [S.V.] and [A.S.] and his statements admitting placing his penis—removing his penis out of his pants rubbing it on [S.V.], in.

"So let me be more specific and global. [Trial counsel] correctly points out that [Evidence Code section] 1108 … requires the Court—the trial court to conduct an analysis under 352 of the Evidence Code before admitting any evidence, prior sexual offenses. The Court in reviewing the material provided, police reports, trial briefs, and comments of counsel, find that there is significant probative value to this [Evidence Code section] 1108 evidence. The conduct is similar in nature to the charged offenses. However, although significant in nature and similar in nature, is not more egregious than the charged conduct. In fact, the charged conduct has allegations of forced violence, etc[.], which is of a nature that I would make it—make the [Evidence Code] 1108 evidence sort of lesser in its prejudicial effects because it's not crimes of violence that would be discussed. These allegations under [Evidence Code section] 1108 are not too remote in the Court's view. Much of the uncharged events occurred between 2012 and 2018. Most far out is perhaps 2010, but since these allegations were brought to light in 2019, even uncharged evidence, the most remote—I don't want to use that word because it's not remote. The farthest that evidence is 2010, less than 10 years from the charged offenses. I don't think by any standard that the [Evidence Code section] 1108 evidence is

---

**19** *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

remote, certainly not under a [Evidence Code section] 352 analysis. Furthermore, I don't think that that evidence is likely to confuse the jury. It's clear that we are talking about a different sister, [S.V.], largely [S.V.] Had testified to things that occurred to her with her brother. I assume [A.S.] will do the same. Be clear to the jurors whose events pertain to whom. They won't likely take up too much of the Court's time or the jury's time. [A.S.] and perhaps—excuse me—[S.V.] and perhaps FSO Deputy Rusche, because I don't think it's going to take an undue consumption of time. As noted by the People these alleged young ladies are sisters. These occurred while they were in their family home with their sibling relationships. The kids were all around 10 to age 13 when these occurred. As I said before, the [Evidence Code section] 1108 evidence does not include use of force, so it's less inflammatory from the charged offenses from the case at bar.

"So just that we are all clear, I will allow [S.V.] to testify to the events going back as far as 2010. [A.S.] can also discuss events if there are those that occurred prior to these charged offenses, and I will allow the People to present [d]efendant's statement in response to those allegations, specifically that he took his penis out and rubbed it on [S.V.], but I'm precluding the People in their Case in Chief from bringing in the statement that the [d]efendant has some unnatural urges in that regard. And that's where we are at."

After both the prosecutor and trial counsel presented their case-in-chief, the following relevant exchange occurred between the trial court and the prosecutor:

"[TRIAL] COURT: … The court reporter was kind enough to provide a—I'll call it a rough transcript of a portion of our pretrial motions, or motions in limine, specifically one that was focus[]ed on Evidence Code [section] 1108 Evidence. At that time the Court heard arguments from the Parties and made a ruling. And before it did that, there was a discussion. And there were a couple of things that are I think of note, and once again this is not an official transcript, but certainly refreshes the Court's memory. I was discussing with counsel the one issue that—I think before me right now, which is the [d]efendant made a statement to a detective, purportedly made a statement to a detective in 2010, wherein he had admitted that he had exposed his penis to his sister, [S.V.], or had rubbed his penis on her leg, something to that effect. And then the question came before the Court about the [d]efendant's statement to the detective that he needed help because he had—sorry—what was the language, sexual urges?

51.

"[PROSECUTOR]: He needs help because he has sexual urges that are hard to control.

"[TRIAL] COURT: Thank you. And in addressing that as we kind of went through it, [trial counsel] had responded, Well, that's going to be something that will come up if he chooses to take the stand, meaning his client. And he will have to answer that to the People. But he went on to state that he wanted to exclude all of it, the entirety of the events. And later when the Court made its ruling, I indicated to the People that they could present the [Evidence Code section] 1108 Evidence, the testimony of [S.V.], as well as the detective to bring in the admissions of the [d]efendant.

"And then in regards to [defendant] stating he needs help because he has sexual urges, I ruled that that would be out—or not allowed in the People's case in chief. And it's certainly not specifically stated by inference, that means it would be subject to impeachment, or perhaps rebuttal evidence. And that's where we are right now.

"[Defendant] has denied any conduct of [S.V.] or [A.S.] that would be construed as illegal or inappropriate. So we are kind of back where we started from. I think it was clear and made clear that if [defendant] testified pretty much opening the door to these issues, and he chose to open that door. So I asked for clarification from [the prosecutor] because in my head I didn't have it before me. I thought he said something about unnatural urges. And to me that would be sort of hard for a 14-year old to decipher what's natural, unnatural, and so forth. But as [the prosecutor] has noted in our informal discussion there really wasn't any confusion in questioning from the detective, and he had made an admission to exposing his penis to his sister. And he said I need help because I have sexual urges that are hard for me to control. So I'm going to allow it. And I'll note [trial counsel's] objection and continuing objection. But after review I think I made it pretty clear what those sort of ground rules were. The People were precluded in their case in chief and they adhered to that. And [defendant] testified. And like I said, he put that subject out there, and you know what the evidence that's used to rebut that…. [T]he court's ruling going forward is Detective Rusche can testify to his interview with [defendant], including the statement about having sexual urges that are hard to control relative to his sisters, if they are towards his sisters.

"And [prosecutor], as you stated, I think it was off the record, I apologize, in regards to [Evidence Code section] 352 and undue consumption of time you said you can do that in one question, and I'll hold you to that, okay.

52.

"[PROSECUTOR]:   Okay.  Your Honor, in regards to that statement only one question.

"[TRIAL] COURT:   That's what I meant.

"Okay.  [Defendant] that's my ruling."

Subsequently, the prosecutor introduced the 2010 police report during the People's rebuttal.  The prosecutor laid the foundation to admit the 2010 police report as a past recollection recorded and requested that "Rusche be able to read the following portions of [Rosa's] statement and [d]efendant's statement into the record."  Trial counsel objected and an unrecorded sidebar conference occurred; the trial court then overruled the objection and allowed the evidence to be admitted.

### B.  Applicable Law

Evidence Code section 1108 "allows evidence of the defendant's uncharged sex crimes to be introduced in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes."  (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009 (*Reliford*).)  "The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters."  (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)  Evidence Code section 1108 reflects a legislative determination that " 'evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.' "  (*People v. Britt* (2002) 104 Cal.App.4th 500, 506, italics omitted.)

" 'To be admissible under Evidence Code section 1108, "the probative value of the evidence of the uncharged crimes 'must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.]" [Citation.] "The principal factor affecting the probative value of an uncharged act is its similarity to

the charged offense. Other factors affecting the probative value include the extent to which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses." [Citation.] "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." ' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 990–991.)

Furthermore, an "exception to the general hearsay rule applies to statements that are inconsistent with a witness's trial testimony. (Evid. Code, § 1235.)" (*People v. Wilson* (2024) 16 Cal.5th 874, 922 (*Wilson*).) "Such statements are admissible for their truth only when the witness has been given 'an opportunity to explain or to deny the statement' or is still subject to providing further testimony, unless 'the interests of justice otherwise require.' [Citations.] When an inconsistent statement is not offered for its truth, but to impeach the credibility of a hearsay declarant, different rules apply. In that circumstance, '[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct.' " (*Id*. at pp. 922–923.)

"A challenge to admission of prior sexual misconduct under Evidence Code sections 1108 and 352 is reviewed under the deferential abuse of discretion standard and will be reversed 'only if the court's ruling was "arbitrary, whimsical, or capricious as a matter of law." ' " (*People v. Robertson*, *supra*, 208 Cal.App.4th at p. 991.)

## C.    *Analysis*

Here, the trial court did not abuse its discretion when it allowed Deputy Rusche to read the 2010 report into the record as a past recollection recorded. This highly relevant evidence permitted the jury to infer a disposition to commit the underlying offenses based on a pattern of escalating behavior. This evidence established defendant exhibited a lack of basic respect for the girls' (A.S. and S.V.) bodies and also demonstrated Rosa's inability to address the abuse from the beginning. Additionally, this evidence corroborated both S.V. and A.S.'s testimony, which strengthened the credibility of both witnesses. Because Evidence Code section 1108 reflects a legislative determination that " 'evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions" (*People v. Britt*, *supra*, 104 Cal.App.4th at p. 506), the trial court acted well within its discretion in admitting these statements in the 2010 police report.

### 1.    <u>Defendant and Rosa's 2010 Statements to Deputy Rusche</u>

Nonetheless, defendant argues the trial court erred when it allowed Rusche to read into the record:  (1) "evidence relating to an alleged sexual assault of [S.V.] in San Diego"; (2) his "statement about watching porn at the age of 13 and kissing [S.V.] on the cheek"; and (3) his "remark about having sexual urges." (Capitalization and emphasis omitted.) However, both Rosa and defendant's statements were properly admitted as prior inconsistent statements pursuant to Evidence Code section 1235. First, Rosa was confronted with her statements to Deputy Rusche regarding the 2010 report and repeatedly testified the report did not reflect "what [she] said." She testified A.S. was lying about the assaults and did not believe that defendant sexually assaulted A.S. However, in the 2010 report, she told Deputy Rusche she was fearful for her children's safety after the 2010 assault took place. Rosa's statements to Deputy Rusche were clearly inconsistent with her trial testimony, and thus were admissible as inconsistent statements pursuant to Evidence Code section 1235.

Second, as to defendant's statements to Deputy Rusche, the trial court concluded he "has denied any conduct of [S.V.] or [A.S.] that would be construed as illegal or inappropriate … [and] it was clear and made clear that if [defendant] testified [it] pretty much open[s] the door to these issues, and he chose to open that door."  The trial court ruled that it "made it pretty clear what those sort of ground rules were.  The People were precluded in their case in chief and they adhered to that.  And [defendant] testified … [and] he put that subject out there."  The trial court ruled that "Rusche can testify to his interview with [defendant], including the statement about having sexual urges that are hard to control relative to his sisters, if they are towards his sisters."  Because defendant flatly denied the allegations made against him, his admissions to Deputy Rusche in 2010 wherein he admitted he "pulled his penis out of his pants and rubbed it on [S.V.]"; that "he kissed [S.V.] on the cheek"; that he would watch a "porn video for hours and hours a day and get[] turned on"; and that "he need[ed] help because he has sexual urges that are hard to control" were clearly inconsistent with his trial testimony, and thus admissible pursuant to Evidence Code section 1235.  These admissions furthered the objectives of Evidence Code section 1108 wherein this evidence was introduced "to demonstrate [] defendant's disposition to commit such crimes."  (*Reliford*, *supra*, 29 Cal.4th at p. 1009.)

### 2.  Admission of S.V.'s Statements to Rosa

Defendant further argues "[i]t was also an abuse of discretion to permit Deputy Rusche to read from the 2010 report what Rosa … told him:  '[S.V.] told [mother] that [defendant] had taken her sister [A.S.] … into the bathroom and kissed her and [S.V.] on the cheek and mouth.  Rosa stated that [S.V.] told her that [defendant] then told her not to tell anyone about it.' "  Specifically, he argues "Rusche's testimony about what [S.V.] told her mother was triple hearsay" and therefore inadmissible.  At the outset, trial counsel did not specifically object to this testimony on the basis of it being inadmissible hearsay, and thus this argument is forfeited on appeal.  (See Evid. Code, § 353; *Partida*, *supra*, 37 Cal.4th at p. 434.)  Nonetheless, this argument fails on its merits.  This statement was

not introduced for its truth, but rather for its effect on the listener (Rosa). (*People v. Ramirez* (2022) 13 Cal.5th 997, 1115 ["Evidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as the effect is relevant to an issue in dispute."].) Rosa's testimony was highly relevant to the defense in that she testified she did not believe defendant ever sexually abused A.S. Therefore, Rusche's testimony was not offered to prove S.V. and A.S. were *in fact* sexually abused, but rather to establish Rosa's knowledge of potential abuse back in 2010. This evidence was intended to impeach Rosa's testimony. Accordingly, Rusche's testimony about Rosa's statements to him were offered for a nonhearsay purpose (effect on listener), and thus were properly admitted by the trial court.

### 3. Rusche's Opinion Regarding Defendant's Deceptive Answers

Defendant further argues that Rusche should not have been permitted to offer lay opinions that: (1) he read defendant his *Miranda* warnings; (2) defendant was deceptive in answering his questions; and (3) Rosa stated "she feels that [defendant] is a danger to her children and that he needs help." Again, trial counsel did not raise this specific objection in the trial court, and thus this argument is forfeited on appeal. (See Evid. Code, § 353; *Partida*, *supra*, 37 Cal.4th at p. 434.) Nonetheless, this argument fails on its merits. "[A] lay witness may express an opinion based on [his] ' "impression of what … [he] observes regarding the appearance and demeanor of another" ' [citation], particularly where the impression ' "rests on 'subtle or complex interactions' between them." ' " (*People v. Guenther* (2024) 104 Cal.App.5th 483, 528 (*Guenther*).) "Such lay opinion 'is admissible where no particular scientific knowledge is required, or as "a matter of practical necessity when the matters … observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner." ' [Citation.] Lay opinion in these instances must be 'rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.' " (*Ibid.*)

Here, Rusche never offered an opinion as to defendant's guilt for the uncharged acts or charged offenses, but rather only offered an opinion as to defendant's demeanor, which was permissible. (*People v. Guenther*, *supra*, 104 Cal.App.5th at p. 528.) Specifically, Rusche testified defendant "was deceptive when answering my questions. When I asked him specific questions *he would look away when answering*." (Italics omitted.) Rusche's testimony was based on his personal observation that defendant "look[ed] away when answering," which allowed the jury to have " 'a clear[er] understanding of [Rusche's] testimony.' " (*Guenther*, *supra*, 104 Cal.App.5th at p. 528.) Overall, the trial court acted within its discretion in permitting this lay opinion testimony.

### 4. Evidence Code Section 352 Analysis

"To determine whether [Evidence Code] section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under [Evidence Code] section 352." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) As briefly noted above, "[r]ather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Daveggio and Michaud*, at pp. 823–824.)

Here, as to all the above-referenced statements, the trial court properly conducted an Evidence Code section 352 analysis. The record is clear the trial court properly analyzed the *Falsetta* factors and concluded: "[t]he conduct is similar in nature to the charged offenses"; the proposed evidence "is not more egregious than the charged conduct"; "[t]hese allegations … are not too remote … [because] [m]uch of the

uncharged events occurred between 2012 and 2018"; and this "evidence is [not] likely to confuse the jury." However, even though all the *Falsetta* factors weighed in favor of admitting in toto the Evidence Code section 1108 evidence, the trial court made a "split decision." Specifically, the trial court allowed the prosecutor in their case-in-chief to "present [d]efendant's statement in response to those allegations, specifically that he took his penis out and rubbed it on [S.V.]" However, the trial court "preclud[ed] the People in their Case in Chief from bringing in the statement that the [d]efendant has some unnatural urges in that regard." Evidence regarding defendant's sexual urges could only be introduced in rebuttal—assuming defendant put on a case-in-chief. After both the prosecutor and trial counsel put on their case-in-chief, the trial court reminded the parties about its previous ruling and held that "going forward … Detective Rusche can testify to his interview with [defendant], including the statement about having sexual urges that are hard to control relative to his sisters, if they are towards his sisters."

We find *People v. Ortiz* (2003) 109 Cal.App.4th 104 (*Ortiz*) instructive. The *Ortiz* court concluded the trial court properly conducted an Evidence Code section 352 analysis because it "neither granted nor rejected admission of the proffered evidence in toto," but "[i]nstead, [the trial court] ruled some of the People's evidence admissible and some inadmissible." (*Ortiz*, at p. 117.) Similar to *Ortiz*, the trial court in this case limited the evidence the prosecutor could use during her case-in-chief. In the event the defense chose not to put on a case, the jury would have never heard defendant's statement regarding his sexual urges. However, once the defendant decided to testify, "he chose to open that door" to this statement coming in during the People's rebuttal. The trial court not only weighed the *Falsetta* factors, but also "split [its] decision" when it partially granted the People's request.

Nonetheless, defendant argues that because he was a minor when he committed the alleged misconduct, which formed the basis for the 2010 police report, "[e]vidence of [his] sexual misconduct as a child may have little relevance in establishing the character

59.

and propensity of an adult." Although defendant's youth was a factor for the trial court to consider, his prior acts against S.V. were highly probative in establishing his pattern of taking advantage of his sibling relationship with both S.V. and A.S. Further, this 2010 uncharged conduct was not so attenuated from when the assaults occurred against A.S. in 2011. Finally, the conduct itself—i.e., the hand over the mouth and the oral copulation— against both S.V. and A.S. were substantially similar to one another. Accordingly, the record is clear the trial court properly weighed all these factors when it decided its probative value was not substantially outweighed by its prejudicial effect pursuant to Evidence Code section 352.[20]

## V.    S.V.'s Testimony

Defendant further contends the trial court prejudicially erred when it allowed S.V. to testify to prior sexual acts "because (1) unforced offenses do not show a disposition to commit forcible offenses, (2) prior offenses that occurred when [he] was himself a juvenile were remote on account of his minority, (3) they were not less inflammatory than charged offenses, (4) they were lacking in any degree of certainty, (5) [he] was not punished for prior offenses, and (6) prior-crime evidence confused the issues in that most

---

[20]    Even assuming the trial court erred it admitting the statements from the 2010 police report, it is hard to imagine defendant suffered prejudice as a result of this presumed error. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227 ["we have held the application of ordinary rules of evidence … does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson, supra*, 46 Cal.2d at p. 836"].) At the time Rusche testified, A.S. had already testified regarding the multiple incidents of sexual abuse—including both charged and uncharged conduct. Further, as we discuss in detail in section V of the Discussion, evidence of S.V.'s abuse had *already* been introduced during the People's case-in-chief via her own testimony. S.V. had already testified to numerous incidents of sexual abuse, including both digital penetration and oral copulation. Accordingly, these 2010 statements from both Rosa and defendant had a minimal effect in comparison to the overwhelming evidence supporting defendant's guilt. (*People v. Collins* (2010) 49 Cal.4th 175, 208 ["Even if we assume defendant's claims are preserved, he suffered no prejudice. The [statements] … were de minimus."].)

of the evidence at trial involved uncharged misconduct rather than charged offenses." We again disagree.

### A. Additional Factual Background

We incorporate by reference the references to the record stated in section IV, subdivision A, of the Discussion. Specifically, as it related to S.V.'s testimony, the trial court stated:

> "I don't think that that [Evidence Code section 1108] evidence is likely to confuse the jury. It's clear that we are talking about a different sister, [S.V.], largely [S.V.] Had testified to things that occurred to her with her brother. I assume [A.S.] will do the same. Be clear to the jurors whose events pertain to whom. They won't likely take up too much of the Court's time or the jury's time. [A.S.] and perhaps—excuse me—[S.V. … because I don't think it's going to take an undue consumption of time. As noted by the People these alleged young ladies are sisters. These occurred while they were in their family home with their sibling relationships. The kids were all around 10 to age 13 when these occurred. As I said before, the [Evidence Code section] 1108 evidence does not include use of force, so it's less inflammatory from the charged offenses from the case at bar.
>
> "So just so that we are all clear, I will allow [S.V.] to testify to the events going back as far as 2010."

### B. Applicable Law

As stated above, "To determine whether [Evidence Code] section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under [Evidence Code] section 352." (*People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 823, quoting *Falsetta*, *supra*, 21 Cal.4th at p. 917.) " 'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the

defendant's other sex offense, or excluding irrelevant though inflammatory details surrounding the offense.' " (*Id*. at pp. 823–824.)

### C.    Analysis

Here, as discussed *ante* in section IV, subdivision C, the trial court properly weighed the *Falsetta* factors when it concluded:  "[t]he conduct is similar in nature to the charged offenses"; the proposed evidence "is not more egregious than the charged conduct"; "[t]hese allegations … are not too remote … [because] [m]uch of the uncharged events occurred between 2012 and 2018"; and this "evidence is [not] likely to confuse the jury."  We find this court's decision in *People v. Soto* (1998) 64 Cal.App.4th 966 (*People v. Soto*) instructive.  In *People v. Soto*, the defendant was convicted of lewd and lascivious conduct with a child under 14 years of age, his niece (A).  (*Id*. at pp. 970, 990.)  The trial court admitted evidence of the defendant's prior sexual conduct involving his sister (L) and another one of the defendant's nieces (R).  (*Id*. at pp. 974, 976.)

On appeal, the defendant challenged the admission of L and R's testimony under Evidence Code section 1108, arguing it was highly inflammatory and should have been excluded under Evidence Code section 352.  (*People v. Soto*, *supra*, 64 Cal.App.4th at p. 991.)  The defendant also argued the prior uncharged acts occurred approximately 20 years before the charged offense and did not involve similar conduct as the charged offense.  (*Id*. at pp. 978, 991.)

This court rejected the defendant's arguments.  It found R and L "presented evidence of prior sexual molestations similar to the incident described by [A]; [the defendant] took advantage of being alone in the house with a very young female relative; he fondled their bodies with his hands and tongue; he fondled and digitally penetrated their vaginal areas; and he engaged in such conduct more than once with each victim." (*People v. Soto*, *supra*, 64 Cal.App.4th at p. 991.)  This court also found the prior acts were not so remote in time as to be inadmissible, noting "the victims were within the same age range as [A] when the prior acts occurred" and "the passage of a substantial

length of time does not automatically render the prior incidents prejudicial." (*Ibid*.) This court determined "the propensity evidence was extremely probative of [the defendant's] sexual misconduct when left alone with young female relatives, and is exactly the type of evidence contemplated by the enactment of [Evidence Code] section 1108 and the parallel federal rules. The prejudice presented by this evidence is the type inherent in all propensity evidence and does not render the evidence inadmissible." (*Id*. at pp. 991–992.)

The facts of *People v. Soto* are analogous to those presented here. The prior uncharged acts against S.V. are similar to the charged acts against A.S. Defendant molested his young sister (S.V.) between the ages of eight and 13. The assaults against both S.V. and A.S. occurred in the bathroom and bedroom. Further, defendant's conduct against S.V. paralleled the type of conduct committed against A.S. During the assaults, defendant placed his hand over both A.S.'s and S.V.'s mouth, and then proceeded to orally copulate his sisters. Defendant's close sibling relationship with both A.S. and S.V. provided him access to his sisters while living at the home, and he waited until he had a moment of seclusion to act. The acts committed against S.V. were highly probative and "exactly the type of evidence contemplated by the enactment of [Evidence Code] section 1108 and the parallel federal rules." (*People v. Soto*, *supra*, 64 Cal.App.4th at pp. 991–992.) Accordingly, we conclude the trial court properly admitted evidence of defendant's prior sexual conduct against S.V. pursuant to Evidence Code sections 1108 and 352.

## VI. The Trial Court Properly Exercised its Discretion When it Chose Not to Instruct the Jury with CALCRIM No. 224

Defendant further contends "the [trial] court erred in failing to instruct with CALCRIM No. 224[21] as a necessary adjunct to CALCRIM No. 1191A."

---

[21] CALCRIM No. 224 states the following:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be

(Capitalization and emphasis omitted.)  Specifically, defendant argues "CALCRIM No. 224 should have been given … because the People relied substantially on circumstantial evidence in the form of other-crime evidence to prove that he committed the charged offenses."  We again disagree.

### A.    Additional Factual Background

Both parties requested the trial court instruct the jury with CALCRIM No. 224. After the jury was instructed, the trial court, prosecutor, and trial counsel had the following relevant exchange:

> "[TRIAL] COURT:     …  I just wanted to put on the record, we had a number of Jury Instruction requests.  These were provided to the Court prior to the completion of evidence.  And with every trial things change and some instructions are not needed….  So what I would propose is just to read the CALCRIM number.  And then at the end if anyone has any further comment or an objection to any of those not given, just let me know and we'll put it on the record….  224, Circumstantial Evidence….  Anything anyone wants to add?
>
> "[TRIAL COUNSEL]:      Nothing by defense, Your Honor.
>
> "[PROSECUTOR]:   Nothing by the People."

The jury was instructed with CALCRIM Nos. 222 and 225,[22] but was not instructed with CALCRIM No. 224.

---

convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

[22]    The trial court instructed the jury with CALCRIM No. 225 (Circumstantial Evidence: Intent or Mental State) as follows:

## B.     Forfeiture

At the outset, the Attorney General contends defendant "forfeited th[is] argument by failing to raise a specific and timely objection to the alleged error … [and that] [w]ithout it, this Court has an inadequate record to aid its review."  Here, the trial court provided trial counsel an opportunity to raise any issues with the omitted jury instructions—including CALCRIM No. 224—when it asked both the prosecutor and trial counsel, "Anything anyone wants to add?"  Trial counsel replied, "Nothing by defense, Your Honor."  Trial counsel did not object to the trial court's jury instructions or request clarifying or amplifying instruction language in the trial court, and thus defendant's claim of instructional error is forfeited.  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*) [instructional error claim regarding aider and abettor liability forfeited by failure to request modification or clarification in the trial court].)  To avoid the

---

"The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent.  The instruction for each crime explains the intent required.

"A intent may be proved by circumstantial evidence.

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

forfeiture doctrine, defendant alternatively argues that "[a]n instruction on the principles contained in [CALCRIM No. 224] 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt.' " Therefore, " 'no trial court action by the defendant [was required] to preserve' " the objection on appeal. Nonetheless, even if we assume the instructional error claim is preserved on appeal, we still conclude the trial court did not prejudicially err when it chose not to instruct the jury with CALCRIM No. 224.

### C. Applicable Law

"The trial court is required to instruct the jury ' " 'on the principles of law relevant to the issues raised by the evidence.' " ' " (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591, quoting *Breverman*, *supra*, 19 Cal.4th at p. 154.) "A trial court must instruct the jury regarding how to evaluate circumstantial evidence ' "sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt." ' " (*Contreras*, at p. 591.)

"CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1172.) CALCRIM No. 224 "is the proper instruction to give unless the only element of the offense that rests substantially or entirely on circumstantial evidence is that of specific intent or mental state." (*People v. Cole* (2004) 33 Cal.4th 1158, 1222.)

### D. Analysis

CALCRIM Nos. 224 and 225 instruct the jury it cannot rely on circumstantial evidence to prove guilt or a mens rea element of the crime if that circumstantial evidence also could point to innocence. But no such limitation applies to propensity evidence. That is because propensity evidence—which is established by a mere preponderance of the evidence—cannot be used to establish an element of the crime. (See *People v. Vichroy* (1999) 76 Cal.App.4th 92, 100; CALCRIM No. 1191A ["[propensity evidence] is

66.

not sufficient by itself to prove that the defendant is guilty [of the charged offense] … beyond a reasonable doubt"].)

Therefore, CALCRIM No. 224 is not given where circumstantial evidence is offered only to bolster or corroborate direct evidence of an element. (*Samaniego*, *supra*, 172 Cal.App.4th at pp. 1171–1172 ["[CALCRIM No. 224] should not be given where circumstantial evidence is incidental to and corroborative of direct evidence"]; *People v. McKinnon* (2011) 52 Cal.4th 610, 676 [analogous instruction CALJIC No. 2.01 "need not be given when circumstantial evidence is merely incidental to and corroborative of direct evidence"].)

Here, the People did not rely on circumstantial evidence alone to prove defendant committed the offenses. Rather, it relied on circumstantial evidence *only* to corroborate the direct evidence of defendant's guilt, i.e., A.S.'s testimony. Because the circumstantial evidence defendant previously molested his other sister, S.V., was not used to prove guilt, CALCRIM No. 225 was better suited to the state of the evidence and there was no reason to instruct the jury using CALCRIM No. 224. Accordingly, the trial court did not err in instructing the jury only with CALCRIM No. 225.[23]

## VII.   CALCRIM No. 1191A

Defendant further contends the trial court violated due process when it instructed the jury with CALCRIM No. 1191A because it permitted the jury to make an irrational

---

[23]    As it relates specifically to prejudice, defendant argues that without reference to the allegations made by S.V., "the People's case was entirely dependent upon allegations made by [A.S.] herself … [and] those allegations were weak and doubtful." However, a "conviction of a sex crime may be sustained upon the corroborated testimony of the [victim]." (*People v. Poggi* (1988) 45 Cal.3d 306, 326.) As previously discussed, A.S. testified in detail to the alleged abuse, and this abuse was partially corroborated by defendant's own statements to Deputy Rusche when he stated, "[H]e needs help because he has sexual urges that are hard to control." Accordingly, when considering the evidence of defendant's guilt apart from the propensity evidence, it is not reasonably probable a result more favorable to defendant would have been reached in absence of the alleged error. (*Watson*, *supra*, 46 Cal.2d at p. 837.)

impermissible inference of propensity. Specifically, defendant argues the prior uncharged offense evidence did not logically tend to prove he committed the charged offenses. We again disagree.

### A. Additional Factual Background

The trial court instructed the jury with CALCRIM No. 1191A (Evidence of Uncharged Sex Offense) as follows:

> "The People presented evidence that the defendant committed the crimes of Lewd and Lascivious Acts on [S.V.] that were not charged in this case. These crimes are defined for you in the next instruction.

> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

> "If the People have not met this burden of proof, you must disregard this evidence entirely.

> "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the offenses as charged in Counts One through Four. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the offenses charged in Counts One through Four. The People must still prove each charge beyond a reasonable doubt.

> "Do not consider this evidence for any other purpose."

### B. Applicable Law

In *Gonzales*, our colleagues in the Second District, Division Six, concluded that giving CALCRIM No. 1191 did not violate the defendant's due process rights. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 502.) The court rejected the defendant's argument

the instruction irrationally allowed the jury to conclude the victim's testimony about uncharged conduct could corroborate her testimony about the charged offenses. (*Ibid*.) It also rejected the defendant's argument the instruction likely resulted in the jury misapplying the beyond a reasonable doubt burden of proof for the charged offenses because the jury could consider the uncharged conduct if it found the uncharged conduct true by a preponderance of the evidence. (*Ibid*.)

Additionally, our colleagues in the Third District reviewed the propriety of this jury instruction anew. (*People v. Panighetti* (2023) 95 Cal.App.5th 978 (*Panighetti*).) In *Panighetti*, the defendant was convicted of several sex offenses for actions he took that exceeded the scope of the victim's consent. (*Id*. at p. 982.) At trial, the victim testified the defendant committed multiple prior uncharged sexual offenses and domestic violence upon her. (*Id*. at p. 996.) This evidence was admitted to establish the defendant's propensity to commit the charged offenses. (*Ibid*.)

The *Panighetti* court concluded that based on our Supreme Court's decision in *Reliford*, *supra*, 29 Cal.4th at p. 1013,[24] CALCRIM No. 1191A complies with the law and does not violate the defendant's due process rights. The *Panighetti* court decided this instruction did not confuse and mislead the jury or lower the reasonable doubt standard for guilt of the underlying crimes. (*Id*. at pp. 997–998.) Specifically, the court rejected the defendant's contention that it is too complicated a task for a jury to distinguish between the burden of proof by a preponderance of the evidence for uncharged conduct and proof beyond a reasonable doubt for charged conduct when the evidence of charged and uncharged crimes comes from testimony of the same victim. (*Id*. at p. 998.)

---

[24] Our Supreme Court in *Reliford* addressed a jury instruction (CALJIC No. 2.50.01) similar in all material respects to CALCRIM No. 1191. (*Reliford*, *supra*, 29 Cal.4th at p. 1012; see *Panighetti*, *supra*, 95 Cal.App.5th at p. 997 ["The version of CALJIC No. 2.50.01 considered in *Reliford* is similar in all material respects to CALCRIM No. 1191A in its explanation of the law on permissive inferences and the burden of proof."].)

### C.    Analysis

Here, for the same reasons articulated in *Gonzales* and *Panighetti*, we conclude CALCRIM No. 1191A accurately states the law and does not violate defendant's due process rights.  Furthermore, this claim was rejected by our Supreme Court in *Reliford*, and we are bound by that decision (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).  Accordingly, the trial court did not err in instructing the jury with CALCRIM No. 1191A.[25]

However, even if we concluded that *Reliford* is not controlling and choose not to follow the reasonings of *Gonzales* and *Panighetti*, we would reach the same result.  We assume that jurors are " ' "intelligent persons and capable of understanding and correlating all jury instructions which are given." ' "  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  Here, the trial court repeatedly instructed the jury the charged offenses had to be proved beyond a reasonable doubt.  Conversely, the trial court only instructed the jury to apply the preponderance of the evidence standard once, and when doing so, it instructed the jury of limited situation where it was to apply that lower standard and that "[t]he People must still prove each charge beyond a reasonable doubt [¶] [and] [d]o not consider this evidence for any other purpose."  Additionally, both the prosecutor and trial counsel told the jury the underlying charges had to be proved beyond a reasonable doubt.  There is nothing in the record to suggest these instructions or arguments from the parties confused the jury.

---

[25]    Defendant focuses a majority of his argument to argue the "the prior crime evidence was inadmissible as propensity evidence because it did not establish a relevant disposition to commit the charged offense."  (Italics omitted.)  However, as discussed *ante* in section V, subdivision C, of the Discussion, the trial court properly weighed the relevance of the uncharged conduct pursuant to the *Falsetta* factors and Evidence Code section 352.

## VIII. Penal Code Section 667.6

Lastly, defendant contends the trial court erred in imposing consecutive life sentences (15 years to life) on counts 1 and 2 because "[t]he finding that the offenses occurred on 'separate occasions' is not supported by substantial evidence, for there was no evidence of any interval between the two offenses to show a reasonable opportunity to reflect." As to this final argument, the Attorney General concedes error. In light of this agreement, we remand to allow the trial court to properly exercise its discretion under section 667.6.

### A. *Additional Factual Background*

At defendant's sentencing, the trial court made the following relevant findings as to counts 1 and 2:

> "Now to the real case at hand, let me just say this, and once again making a record: The facts proven to a jury demonstrate two separate and distinct crimes of violence. Frankly, even if the Court has—does have discretion to impose something less than the full-term consecutive sentence, the Court would not exercise such discretion. The violent crimes here were committed upon an innocent young family member, and they are deserving of full-term consecutive sentencing treatment. Having said that, the term imposed in Count 1 as provided by law is 15 years to life. The term in Count 2 is also 15 years to life. The Court is going to run those consecutive."

Prior to the court adjourning the case, defendant's new defense attorney asked, "[I]n imposing the full consec on Counts 1 and 2, is the Court making the finding that there were separate occasions rather than one continuous course of action?" The trial court replied that it was.

### B. *Applicable Law*

Section 667.6, subdivision (d) states in relevant part the following:

"(d)(1)  A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e)[26] if the crimes involve separate victims or involve the same victim on separate occasions.

"(2)  In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."  (§ 667.6, subd. (d)(1)-(2).)

"Under the broad standard established by Penal Code section 667.6, subdivision (d), the Courts of Appeal have not required a break of any specific duration or any change in physical location."  (*People v. Jones* (2001) 25 Cal.4th 98, 104.)  "A finding that the defendant committed the sex crimes on separate occasions 'does not require a change in location or an obvious break in the perpetrator's behavior.' "  (*People v. King* (2010) 183 Cal.App.4th 1281, 1325, fn. omitted.)

"In applying this standard, courts have held, for example, the offenses of placing a finger in the victim's vagina, kissing her genitals and then placing his penis in her vagina were but a single occasion.  [Citations.]  Similarly, where a defendant raped the victim, then ' "got off of her, twisted her by the legs violently, and orally copulated her," ' the offenses occurred on a single occasion.  [Citations.]  [¶]  In contrast, where the offenses are interrupted by the defendant's nonsexual activity, they occur on a separate occasion.  [Citation.]  Where a defendant left a car after a bout of sexual assault, but returned

---

26    Section 667.6, subdivision (e) states in relevant part the following:

"(e)  This section shall apply to the following offenses:

"(1)  Rape, in violation of paragraph (2), (3), (6), or (7) of subdivision (a) of Section 261.  [¶] … [¶]

"(7)  Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 287 …."  (§ 667, subd. (e)(1) & (7).)

15 minutes later and raped the victim a second time, the second rape occurred on a separate occasion. [Citations.] Where the defendant moved the victim from one place to another, and also stopped an assault to listen to the victim's answering machine before resuming, the offenses occur on separate occasions. [Citations.] Where the defendant's assault was interrupted by the outside event of an observer driving by, but then resumed the assault, it indicated reflection by the defendant, and the second assault occurred on a separate occasion." (*People v. Dearborne* (2019) 34 Cal.App.5th 250, 265–266.)

"Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092.)

### C.    *Analysis*

Here, the record is clear defendant did not have an adequate opportunity to reflect between the two offenses (counts 1 & 2). A.S. testified that defendant immediately removed his penis from her vagina and placed it in her mouth. As the *Dearborne* court succinctly laid out, there must be some intervening act required for the offenses against a single victim to be committed on "separate occasions" under section 667.6, subdivision (d). (*Dearborne*, *supra*, 34 Cal.App.5th at pp. 265–266.) A.S.'s testimony that defendant "immediately" forced her to orally copulate him after penetrating her vagina, without an intervening act, was insufficient to support the trial court's finding the offenses occurred on separate occasions under section 667.6, subdivision (d). Accordingly, remand is appropriate for the trial court to exercise its discretion pursuant to section 667.6.

### DISPOSITION

The sentence is vacated and the matter is remanded for resentencing. At resentencing, the trial court is directed to prepare an amended abstract of judgment and

forward certified copies of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                          DE SANTOS, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.